1
2
3
4
5
6
7

8        IN THE UNITED STATES DISTRICT COURT

9      FOR THE WESTERN DISTRICT OF WASHINGTON

10                    AT SEATTLE

11  THE COMPHY CO.,                         Case No. 2:18-cv-01460-RSM

12                      Plaintiff,          **DEFENDANT AMAZON.COM, INC.'S**
                                            **OPPOSITION TO PLAINTIFF THE**
13          v.                              **COMPHY CO.'S SECOND AMENDED**
                                            **MOTION FOR PRELIMINARY**
14  AMAZON.COM, INC.,                       **INJUNCTION**

15                      Defendant.          NOTE ON MOTION CALENDAR:
16                                          NOVEMBER 2, 2018

17                                          Suite:   13206
                                            Judge:   Honorable Ricardo S. Martinez
18

19
20
21
22
23
24
25
26
27
28

AMAZON'S OPP. TO COMPHY'S 2ND AM. MTN FOR          Davis Wright Tremaine LLP, 1201 Third Avenue, Ste. 2200,
PRELIM. INJUNCTION / CASE NO. 2:18-CV-01460-RSM      Seattle, WA  98101, (206) 622-3150· Fax: (206) 757-7700

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND ...................................................................................2

III.  PLAINTIFF HAS NOT ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE
      MERITS ...................................................................................................................3

      A.    Ninth Circuit law applies to Plaintiff's claims in this case, and holds that the very
            conduct at issue does not violate the trademark laws. ...........................................3

      B.    The Comphy Company is not likely to succeed on the merits of its trademark
            infringement or false-designation-of-origin claims. .............................................7

            1.    The Comphy Company's trademark rights with respect to home bedsheets
                  are exceptionally weak, if they exist at all. ..............................................8

                  a.    Plaintiff's trademark registration gives rise to a presumption of
                        secondary meaning only when used in connection with spa linens
                        and only as to Plaintiff's logo—neither of which is the case here..............9

                  b.    The claimed trademark is descriptive since Plaintiff's bedsheets are,
                        in fact, comfy (or "comphy"). ....................................................10

                  c.    Survey evidence shows that the term COMPHY lacks secondary
                        meaning among the relevant consumers. ....................................12

            2.    The evidence of actual confusion is limited to consumers who purchased
                  COMFY sheets but intended to buy COMPHY sheets, and Plaintiff
                  accepted the risk of such confusion when it chose a common misspelling of
                  a descriptive word as its brand name. ...................................................14

            3.    The target consumers are different, since Plaintiff targets only those who
                  have slept on its bedsheets at particular hotels and bed-and-breakfasts, and
                  Defendant targets all consumers of bedsheets. ......................................15

            4.    Consumers of luxury bed sheets exercise a reasonable degree of care.................15

            5.    There is no evidence that Amazon intended to confuse consumers, only
                  that Amazon offered competing products to consumers who search for
                  Plaintiff's products. .............................................................................16

      C.    The Comphy Company is not likely to succeed on the merits of its contributory-
            infringement claim. ..............................................................................................17

IV.   PLAINTIFF HAS NOT ESTABLISHED IRREPARABLE HARM OR THE OTHER
      NECESSARY ELEMENTS FOR A GRANT OF PRELIMINARY INJUNCTION...................18

A.   The Comphy Company has not met its burden to show a likelihood of irreparable harm. ..................................................................................................18

1.   There is no emergency justifying a preliminary injunction. ...................18

a.   Plaintiff has known about the facts underlying this motion since at least May 31, 2015. ..................................................................................18

b.   The magnitude of this issue has remained constant for more than a year. ........................................................................................................20

2.   The claimed harm is compensable in damages. ......................................20

B.   The balancing of the equities does not favor issuance of a preliminary injunction. ..........21

C.   The proposed preliminary injunction is vague and overbroad, and the public interest would be disserved by the grant of an injunction ................................22

V.   CONCLUSION..................................................................................................22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AMF Inc. v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 1979) .................................................................................7, 8

*AMID, Inc. v. Medic Alert Found. United States, Inc.*,
  241 F. Supp. 3d 788 (S.D. Tex. 2017) ....................................................................13

*Ashland Oil, Inc. v. Olymco, Inc.*,
  No. 94-5520, 1995 WL 499466 (6th Cir. Aug. 21, 1995) ......................................13

*Brookfield Commc'ns, Inc. v. W. Coast Entm't. Corp.*,
  174 F.3d 1036 (9th Cir. 1999) ...........................................................................8, 16

*Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*,
  533 F. Supp. 75 (S.D. Fla. 1981) ...........................................................................13

*C-Thru Ruler Co. v. Needleman*,
  No. 74-2019, 1976 WL 21018 (E.D. Pa. Feb. 25, 1976) .......................................12

*Cairns v. Franklin Mint Co.*,
  24 F. Supp. 2d 1013 (C.D. Cal. 1998) ....................................................................13

*Celebrity Chefs Tour, LLC v. Macy's, Inc.*,
  16 F. Supp. 3d 1141 (S.D. Cal. 2014).......................................................................8

*Citizens Banking Corp. v. Citizens Fin. Grp., Inc.*,
  No. 07-11514, 2008 WL 1995104 (E.D. Mich. May 6, 2008) ...............................13

*Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*,
  125 F.3d 28 (2d Cir. 1997)......................................................................................15

*E & J Gallo v. Proximo Spirits, Inc.*,
  No. CV-F-10-411 LJO JLT, 2012 WL 273076 (E.D. Cal. Jan. 30, 2012) ...........10

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*,
  654 F.3d 958 (9th Cir. 2011) ..................................................................................12

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
  76 F.3d 259 (9th Cir. 1996) ....................................................................................17

*GoTo.com, Inc. v. Walt Disney Co.*,
  202 F.3d 1199 (9th Cir.2000) ...........................................................................15, 16

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013) ...........................................................................18, 20

*In Re Hunke & Jochheim*,
    185 U.S.P.Q. (BNA) 188, 1975 WL 20781 (T.T.A.B. Jan. 16, 1975)................................11

*Igloo Prods. Corp. v. Brantex, Inc.*,
    202 F.3d 814 (5th Cir. 2000) ................................................................................10

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
    456 U.S. 844 (1982)...........................................................................................7, 9, 11

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
    543 U.S. 111 (2004)................................................................................................15

*Levi Strauss & Co. v. Blue Bell, Inc.*,
    778 F.2d 1352 (9th Cir. 1985) ..............................................................................9, 12

*Lydo Enters., Inc. v. City of Las Vegas*,
    745 F.2d 1211 (9th Cir. 1984) ..............................................................................18, 20

*Multi Time Machine, Inc. v. Amazon.com, Inc.*,
    804 F.3d 930 (9th Cir. 2015) ................................................................................*passim*

*In re Nett Designs, Inc.*,
    236 F.3d 1339 (Fed. Cir. 2001)..............................................................................11

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
    638 F.3d 1137 (9th Cir. 2011) ..............................................................................8, 15, 16, 17

*Nordstrom, Inc. v. NoMoreRack Retail Grp., Inc.*,
    No. C12-1853-RSM, 2013 WL 1196948 (W.D. Wash. Mar. 25, 2013)....................7, 8, 14

*Norm Thompson Outfitters, Inc. v. Gen. Motors Corp.*,
    448 F.2d 1293 (9th Cir. 1971) ..............................................................................12

*Oakland Chem. Co. v. Bookman*,
    22 F.2d 930 (2d Cir. 1927) (Hand, J.)....................................................................11

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
    762 F.2d 1374 (9th Cir. 1985) ..............................................................................18, 19

*Pollution Denim & Co. v. Pollution Clothing Co.*,
    547 F. Supp. 2d 1132 (C.D. Cal. 2007) ................................................................10

*Roselux Chem. Co. v. Parsons Ammonia Co.*,
    299 F.2d 855 (C.C.P.A. 1962) ..............................................................................13

*Sampson v. Murray*,
    415 U.S. 61 (1974)................................................................................................20

*In re Save Venice New York, Inc.*,
    259 F.3d 1346 (Fed. Cir. 2001)..............................................................................10

*Spiraledge, Inc. v. SeaWorld Entm't, Inc.*,
    109 U.S.P.Q.2d 1774, 2013 WL 3467435 (S.D. Cal. July 9, 2013) ....................................20

*Studio Red Inc. v. Rockwell Architecture Planning & Design, P.C.*,
    No. C 07-396 CW, 2007 WL 1462458 (N.D. Cal. May 18, 2007)......................................19

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
    610 F.3d 1171 (9th Cir. 2010) ..........................................................................................16

*Vision Sports, Inc. v. Melville Corp.*,
    888 F.2d 609 (9th Cir. 1989) ............................................................................................12

*Zippo Mfg. Co. v. Rogers Imports, Inc.*,
    216 F. Supp. 670 (S.D.N.Y. 1963) ...................................................................................13

**Statutes**

15 U.S.C. § 1051, *et seq.*...................................................................................................................3

15 U.S.C. § 1065 ...............................................................................................................................9

15 U.S.C. § 1114.........................................................................................................................7, 14

15 U.S.C. § 1125(A)(1)......................................................................................................................8

# I.    INTRODUCTION

This is a case about polyester bedsheets.  Currently, when one searches on Amazon.com for "comfy sheets," "comphy sheets," or some similar term, Amazon returns a list of products relevant to that search.  Plaintiff The Comphy Company has chosen not to sell its bedsheets on Amazon.  But competing products are sold on Amazon, and appear in response to that search.  In this motion, The Comphy Company seeks a preliminary injunction requiring, among other things, that Amazon return "No Results" when someone searches on Amazon for "comfy sheets," "comphy sheets," or the like.

There are a number of problems with this claim.  The most prominent is that it is directly contrary to binding Ninth Circuit precedent.  In *Multi Time Machine v. Amazon.com, Inc.*, the Ninth Circuit ruled that precisely the conduct at issue here—Amazon's practice of offering competing brands to consumers searching for one specific brand—does not constitute trademark infringement, as a matter of law.  That is why Plaintiff, a company based in this District, initially filed this case in Illinois, in an attempt to evade the effect of *Multi Time Machine*.

That is not the only problem:  the next is that The Comphy Company actually doesn't own any trademark rights in the mark COMPHY.  The Comphy Company owns no relevant trademark registrations; its one registration is for its logo (and therefore irrelevant to alleged infringement through words alone) and is for "linens and bedding for health spas" (and therefore irrelevant to alleged infringement relating to home bedding).  "Comphy" is a common misspelling of "comfy," a term descriptive of Plaintiff's sheets.  For that reason, in order to have trademark rights in that term, Plaintiff would need to show that the relevant consumers regard COMPHY as an indicator of a particular source of bedsheets, rather than as an adjective describing a positive quality of those bedsheets.  Survey evidence shows a net rate of recognition of one-half of one percent among the relevant consumers.  This alone would justify denial of the motion for preliminary injunction.  And the remaining factors relating to likelihood of success on the merits do not disturb that conclusion.

The Comphy Company has also failed to meet its burden to show a likelihood of irreparable harm if a preliminary injunction is denied.  Plaintiff has known about the key facts underlying its motion for more than three years—since May 31, 2015, when its CEO took a screenshot of an Amazon search for "comphy co sheets."  And Plaintiff's employee responsible for contact with retail customers testified

1   that, setting aside regular seasonal variations, the magnitude of the issue with Amazon has remained the

2   same as long as she had been at the company.  To the extent there is any cognizable harm from the

3   challenged conduct, it is compensable in damages (and therefore not irreparable), to the tune of precisely

4   ███████ for 2018.

5          But this is not a case that will reach a damages assessment, because The Comphy Company does

6   not own trademark rights in the term COMPHY, and even if it did, the Ninth Circuit has ruled that

7   Amazon's practice of offering competing products in response to searches is consistent with the

8   trademark laws.  The motion for preliminary injunction should be denied.

9   **II.     FACTUAL BACKGROUND**

10         According to the complaint, The Comphy Company sells "a variety of high end, luxury products,

11  including luxury linens and bedding."  Dkt. # 1 ¶ 7.  The Comphy Company's "brand strategy has always

12  focused on providing the most innovative, luxurious, and high-quality linens and sheets available, and

13  excellent customer service."  Dkt. # 34 ("Richardson Aff.") ¶ 19.  "To that end, [The Comphy Company]

14  brand products are not discounted, and are not offered with free shipping."  *Id.*  Prior to 2013, The

15  Comphy Company did not sell directly to consumers.  *Id.* ¶¶ 17-18; *see also* Dkt. # 34-11 at p. 25 ("[I]n

16  effort not to compete with our vendors for the same end consumers, we do not sell to the public.").

17  Although The Comphy Co. now sells directly to consumers, it does not advertise to consumers.  Instead,

18  it has "always marketed through [its] wholesale customers and the experience or word of mouth."

19  Declaration of Joseph Gratz submitted herewith ("Gratz Decl."), Ex. A ("Richardson Dep. Tr."), at

20  130:3-16.

21         Amazon.com, Inc., through its subsidiaries (collectively, "Amazon"), is a leading online retailer

22  of consumer goods, with retail websites and physical stores that focus on selection, price, and

23  convenience.  Gratz Decl., Ex. B ("Amazon 2017 10-K"), at 3.  Amazon's websites "enable hundreds of

24  millions of unique products to be sold by [Amazon] and by third parties across dozens of product

25  categories."  *Id.*  Amazon views it principal competitive factors to include "selection, price, and

26  convenience, including fast and reliable fulfillment."  *Id.* at 4.  Amazon "direct[s] consumers to [its]

27  websites primarily through a number of targeted online marketing channels, such as . . . sponsored

28  search . . . ."  *Id.* at 28.

1    The Comphy Company has chosen not to sell its products on Amazon.  Richardson Aff. ¶ 26.

2    When a consumer searches for "comphy company sheets" on Amazon, Amazon offers competing brand

3    sheets, including sheets marketed by a third-party Amazon seller called "Comfy Sheets."  Dkt. # 1-08 at

4    p. 2.  Amazon also advertises that it sells "comfy sheets" on Google and Bing.  Dkt. # 1-12 & 1-13.

5    On July 2, 2018, Plaintiff filed suit against Amazon.  As discussed more fully below, The

6    Comphy Company claims, *inter alia*, that Amazon violates The Comphy Company's rights under the

7    Lanham Act, 15 U.S.C. § 1051, *et seq.*, when, in response to a customer's inquiry to search engines or

8    Amazon for "comphy sheets," Amazon advertises and offers to sell consumers products that compete

9    with The Comphy Company's products, including "comfy sheets."  Dkt. # 1 ¶¶ 19-24.

10   **III.    PLAINTIFF HAS NOT ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE
         MERITS**

11
12       **A.    Ninth Circuit law applies to Plaintiff's claims in this case, and holds that the very
             conduct at issue does not violate the trademark laws.**

13   Plaintiff's principal claim in this case is that Amazon violated the Lanham Act when a consumer

14   searched for "comphy company sheets" on Amazon, and—since Plaintiff's products are not available via

15   Amazon—Amazon showed products not made by Plaintiff in response to that search, marked with those

16   products' respective brand names.  This is not the first time such a claim has been made against Amazon

17   by a company upset that consumers purchased competing products.

18   The Ninth Circuit considered a claim almost identical to The Comphy Company's claim in 2015

19   and rejected it, in *Multi Time Machine, Inc. v. Amazon.com, Inc.*, 804 F.3d 930 (9th Cir. 2015).  That

20   opinion controls this case.

21   In *Multi Time Machine*, the plaintiff, MTM, chose not to sell its wristwatches through Amazon.

22   When consumers searched for MTM's wristwatches on Amazon, Amazon showed competing

23   wristwatches.  MTM sued for trademark infringement, bringing a claim virtually identical to The

24   Comphy Company's claim in this case:  "that the design of Amazon's search results page creates a

25   likelihood of initial interest confusion because when a customer searches for MTM Special Ops watches

26   on Amazon.com, the search results page displays the search term used—here, 'mtm special ops'—

27   followed by a display of numerous watches manufactured by MTM's competitors and offered for sale by

28

AMAZON'S OPP. TO COMPHY'S 2ND AM. MTN FOR
PRELIM. INJUNCTION / CASE NO. 2:18-CV-01460-
RSM – 3

Davis Wright Tremaine LLP, 1201 Third Avenue, Ste. 2200,
Seattle, WA  98101, (206) 622-3150· Fax: (206) 757-7700

Amazon, without explicitly informing the customer that Amazon does not carry MTM watches." *Multi Time Machine*, 804 F.3d at 936 (footnote omitted).

The Ninth Circuit held that "the products at issue are clearly labeled by Amazon to avoid any likelihood of initial interest confusion by a reasonably prudent consumer accustomed to online shopping." *Id.* at 937-38.  The court explained that "[w]hen a shopper goes to Amazon's website and searches for a product using MTM's trademark 'mtm special ops,' the resulting page displays several products, all of which are clearly labeled with the product's name and manufacturer in large, bright, bold letters and includes a photograph of the item." *Id.* at 938.  "Because Amazon clearly labels each of the products for sale by brand name and model number accompanied by a photograph of the item, it is unreasonable to suppose that the reasonably prudent consumer accustomed to shopping online would be confused about the source of the goods." *Id.*

MTM argued "that in order to eliminate the likelihood of confusion, Amazon must change its search results page so that it explains to customers that it does not offer MTM watches for sale before suggesting alternative watches to the customer." *Id.*  The Ninth Circuit disagreed:  "The search results page makes clear to anyone who can read English that Amazon carries only the brands that are clearly and explicitly listed on the web page." *Id.*  "In light of the clear labeling Amazon uses on its search results page," the Ninth Circuit held, "no reasonable trier of fact could conclude that Amazon's search results page would likely confuse a reasonably prudent consumer accustomed to shopping online as to the source of the goods being offered." *Id.*

This comports with consumer expectations in the offline world.  If a customer walks into Nordstrom and asks where she can find a Citizen brand watch, a Nordstrom sales associate could fairly direct her to the Nordstrom watch counter, even if Nordstrom does not carry Citizen brand watches.  And Nordstrom is not required to post a sign at the watch counter announcing, "Sorry, Nordstrom does not carry Citizen watches" to avoid accusations of trademark infringement.  The situation is no different online.  When a consumer asks Amazon for an MTM Special Ops watch, the Ninth Circuit held, Amazon should be able to direct the consumer to a virtual "watch counter" that displays clearly labeled alternatives.  The Ninth Circuit conceded that it was "possible that someone, somewhere might be

1   confused by the search results page." *Id.* "But," the court held, such "unreasonable, imprudent and

2   inexperienced web-shoppers are not relevant." *Id.* (internal quotation marks and citation omitted).

3   This explains why a bedsheet company based in the Western District of Washington initially

4   brought this case in the Northern District of Illinois: because The Comphy Company knows that the

5   Ninth Circuit's holding in *Multi Time Machine* causes serious problems for its claim. Indeed, it appears

6   to be the only justification for filing the case in Illinois, as the court in Illinois recognized. Gratz Decl.,

7   Ex. C at 2-3. Now that the case has been transferred to this Court, however, Ninth Circuit precedents—

8   including *Multi Time Machine*—apply to Plaintiff's claim, and control the result here. Just as a

9   Nordstrom sales associate could direct a consumer to the watch counter when asked about a Multi Time

10  Machine watch, the same sales associate could direct a consumer to the bedding department when asked

11  about Comphy sheets. And Amazon does not commit trademark infringement by directing a consumer

12  making the same inquiry online to a set of clearly labeled alternatives to Comphy sheets.

13  Plaintiff attempts to distinguish *Multi Time Machine* on one ground: They argue that here, the

14  product search results lack the sort of "'clear' and 'unambiguous' branding" that would "'eliminate'

15  initial confusion." Mot. at 9 (quoting *Multi Time Machine*, 804 F.3d at 938). But the Amazon search-

16  result layout at issue in *Multi Time Machine* is substantially identical to the layout at issue here. In both

17  cases, each brand is identified by a brand name that appears after the product name: "by Luminox" or

18  "by Chase-Durer" in the *Multi Time Machine* case, and "by Comfy Sheets" or "by HC COLLECTION"

19  in the example that Plaintiff chose to include in its Complaint:



26  *Multi Time Machine*, 804 F.3d at 934 (detail).







Dkt. # 1-08 at p. 2 (detail).  Apart from the clarity of Amazon's labelling, Plaintiff also appears to contend that *Multi Time Machine* is distinguishable on additional grounds it mentions only in its introduction, and does not discuss in connection with *Multi Time Machine* in the argument section of its brief.  *First*, Plaintiff appears to contend that the inclusion of the designation "Amazon's Choice" on a product in connection with a search for "comphy sheets" makes this case different from *Multi Time Machine*.  While Amazon believes that designating a product as "Amazon's Choice" among the search results for any given search does not create any likelihood of confusion, in the interest of narrowing the issues on this motion Amazon has disabled the "Amazon's Choice" feature for all searches for bedding products that include the term "comphy."  Declaration of Kim Wilber submitted herewith ("Wilber Decl."), ¶ 10.  *Second*, Plaintiff argues that Amazon's "ads on third party search engines, such as [G]oogle," as set forth in Exhibit 12 to the Complaint, set this case apart from *Multi Time Machine* because those ads "falsely represent to potential customers that genuine Comphy brand products are available at Amazon."  Mot. at 4.  But those ads are just as clearly labelled as the product listings in *Multi Time Machine*, identifying the third-party brand that in question ("Comfy Sheets") and making no mention of Plaintiff's brand name.

**Comfy Sheets Queen - Amazon | Free 2-day Shipping w/ Prime**
Ad  www.amazon.com/bedding ▾
Compare Prices on Comfy **sheets** queen in Bedding. Read Ratings & Reviews. Explore Amazon Devices. Shop Our Huge Selection. Stream Videos Instantly. Shop Best Sellers & Deals.

As discussed below, Amazon does not believe that Plaintiff possesses trademark rights sufficient to prevent a competitor from calling its own comfy sheets "Comfy Sheets."  But if this Court finds that the third party who sells "Comfy Sheets" on Amazon is infringing Plaintiff's rights, the relief on this motion should be limited to an order directing Amazon to remove "Comfy Sheets" from sale.  Any broader relief would be directly contrary to *Multi Time Machine*.

**B.    The Comphy Company is not likely to succeed on the merits of its trademark infringement or false-designation-of-origin claims.**

"To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, a plaintiff must prove:  (1) it has a protectable ownership interest in the mark, and (2) defendant's use of the mark is likely to cause consumer confusion."  *Nordstrom, Inc. v. NoMoreRack Retail Grp., Inc.*, No. C12-1853-RSM, 2013 WL 1196948, at *2 (W.D. Wash. Mar. 25, 2013).  In order to establish a protectable ownership interest in the mark, a plaintiff must come forward with an applicable trademark registration raising a presumption of a protectable ownership interest, or in the absence of a registration for the asserted mark must show "that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself."  *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982).  With respect to likelihood of confusion, "[c]ourts look to eight relevant factors as an adaptable proxy:  '(1) strength of the mark; (2) proximity of the goods, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) type of goods and the degree of care likely to be exercised by the purchaser, (7) defendant's intent in selecting the mark, and (8) likelihood of expansion of the product lines.'"  *Nordstrom*, 2013 WL 1196948, at *2 (quoting *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)).  "[T]he *Sleekcraft* factors are not exhaustive and other variables may come into play depending on the particular facts presented."  *Multi Time Machine*, 804 F.3d at 936.  "Indeed, in evaluating claims of trademark infringement in cases involving Internet search engines, [the Ninth Circuit has] found particularly important an additional

1  factor that is outside of the eight-factor *Sleekcraft* test:  'the labeling and appearance of the

2  advertisements and the surrounding context on the screen displaying the results page.'" *Id.* (quoting

3  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1154 (9th Cir. 2011)).

4      "In certain contexts involving domain names or URLs, courts have used the 'Internet troika'

5  approach, in which more emphasis is placed on three of the *Sleekcraft* factors: (i) similarity of the marks,

6  (ii) relatedness of the goods and services, and (iii) simultaneous use of the Internet as a marketing

7  channel." *Nordstrom*, 2013 WL 1196948, at *2.  Plaintiff argues that these factors are "most important

8  in the context of internet commerce." Mot. at 8.  But "this Court has also found that Internet consumers

9  apply different levels of scrutiny depending on the circumstances, so this approach sheds little light" in

10  other circumstances. *Nordstrom*, 2013 WL 1196948, at *2.  And, indeed, the Ninth Circuit has agreed,

11  holding that "it makes no sense to prioritize the same three factors for every type of potential online

12  commercial activity." *Network Automation, Inc.*, 638 F.3d at 1148.  Accordingly, as in *Nordstrom*, this

13  Court should "not restrict its analysis" and should consider all the factors.

14      Plaintiff also brings a claim for false designation of origin under 15 U.S.C. § 1125(A)(1).  Mot. at

15  15.  "A claim for false designation of origin is subject to '[t]he same standard,'" as a claim for trademark

16  infringement, "except a claim for false designation of origin does not require that the mark be

17  registered."  *Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 16 F. Supp. 3d 1141, 1152 (S.D. Cal. 2014)

18  (quoting *Brookfield Commc'ns, Inc. v. W. Coast Entm't. Corp.*, 174 F.3d 1036, 1046 n.6 (9th Cir. 1999)).

19      **1.    The Comphy Company's trademark rights with respect to home bedsheets**
20              **are exceptionally weak, if they exist at all.**

21      "The stronger a mark—meaning the more likely it is to be remembered and associated in the

22  public mind with the mark's owner—the greater the protection it is accorded by the trademark laws."

23  *Brookfield Commc'ns, Inc.*, 174 F.3d at 1058.  "Two relevant measurements are conceptual strength and

24  commercial strength." *Network Automation, Inc.*, 638 F.3d at 1149.  "Conceptual strength involves

25  classification of a mark along a spectrum of generally increasing inherent distinctiveness as generic,

26  descriptive, suggestive, arbitrary, or fanciful."  *Id.* (internal quotation marks and citation omitted).

27  "Commercial strength is based on actual marketplace recognition, and thus advertising expenditures can

28  transform a suggestive mark into a strong mark."  *Id.*  Where a mark is low in conceptual strength, a

AMAZON'S OPP. TO COMPHY'S 2ND AM. MTN FOR
PRELIM. INJUNCTION / CASE NO. 2:18-CV-01460-
RSM – 8

Davis Wright Tremaine LLP, 1201 Third Avenue, Ste. 2200,
Seattle, WA  98101, (206) 622-3150· Fax: (206) 757-7700

1   showing of commercial strength is necessary to establish that the mark has "secondary meaning"—"that,

2   in the minds of the public, the primary significance of a product feature or term is to identify the source

3   of the product rather than the product itself." *Inwood Labs., Inc.*, 456 U.S. at 851 n.11.

4       We begin below by explaining why Plaintiff's trademark registration for its logo does not give

5   rise to a presumption that Plaintiff has rights in the word COMPHY (or any other related, non-registered

6   mark). We go on to discuss the conceptual strength of Plaintiff's mark, explaining that because

7   Plaintiff's sheets are comfy, the mark COMPHY is categorized as descriptive, and has very low

8   conceptual strength. Finally, we discuss the commercial strength of Plaintiff's rights in COMPHY,

9   presenting survey evidence showing a net rate of recognition of one-half of one percent of consumers of

10  luxury bedsheets, showing that the term COMPHY lacks secondary meaning.

11              **a.      Plaintiff's trademark registration gives rise to a presumption of**
                **secondary meaning only when used in connection with spa linens and**
12              **only as to Plaintiff's logo—neither of which is the case here.**

13      Plaintiff has only one trademark registration—No. 3,479,190, reproduced as Exhibit 5 to the

14  Complaint. Dkt. # 1-05 at p. 2. "The mark consists of an enlarged, stylized 'C' that encompasses the

15  letters 'OMPHY' in COMPHY, with the words 'THE' and 'CO.' being located above and below the

16  'C'." *Id.* The goods identified in the registration are "linens and bedding for health spas" and "robes for

17  health spas." *Id.*

18      Plaintiff argues that its trademark rights are strong because it has a registration, and that

19  registration is "incontestable" pursuant to 15 U.S.C. § 1065. Dkt. # 71 at p. 5. That registration,

20  however is irrelevant, because it is for a different mark and for different goods than those at issue here.

21      "[R]egistration constitutes prima facie evidence of a protected interest with respect to the goods

22  specified in the registration only." *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir.

23  1985) (holding that a registration for a pocket tab on pants did not establish secondary meaning for a tab

24  as applied to shirts). This lawsuit is about linens sized for use on a standard size bed, not linens and

25  bedding for health spas. Richardson Dep. Tr. at 55:13-18. Linens and bedding for health spas are

26  designed specifically for use on a massage table; they cannot be used on a standard size bed in a home.

27  *Id.* at 35:11-37:11; 55:1-9. There is no overlap between the goods claimed in the registration ("linens

28  and bedding for health spas") and the goods at issue here (linens for use on beds, rather than massage

AMAZON'S OPP. TO COMPHY'S 2ND AM. MTN FOR
PRELIM. INJUNCTION / CASE NO. 2:18-CV-01460-
RSM – 9

Davis Wright Tremaine LLP, 1201 Third Avenue, Ste. 2200,
Seattle, WA  98101, (206) 622-3150· Fax: (206) 757-7700

1  tables).  The existence of Plaintiff's registration does nothing to establish that it has trademark rights with

2  respect to the goods at issue here—home bedsheets.

3        Any presumption that results from registration "pertains to the whole mark . . . rather than to any

4  individual portion of the mark."  *Igloo Prods. Corp. v. Brantex, Inc.*, 202 F.3d 814, 817 (5th Cir. 2000)

5  (no presumption of secondary meaning in the words KOOL PAK where the registration was for the

6  words KOOL PAK alongside a picture of a penguin).  There is no claim that there has been infringing

7  use of the stylized "C" logo in the form registered, or of any "enlarged, stylized 'C'" at all.  Thus, the

8  registration gives rise to no presumption of any rights in any mark alleged to have been infringed here.

9        The same is true of any presumption arising out of the alleged "incontestable" status of Plaintiff's

10 trademark registration, since "[a] registered mark is incontestable only in the form registered and for the

11 goods or services claimed."  *In re Save Venice New York, Inc.*, 259 F.3d 1346, 1353 (Fed. Cir. 2001).

12 *See also, e.g., E & J Gallo v. Proximo Spirits, Inc.*, No. CV-F-10-411 LJO JLT, 2012 WL 273076, at *11

13 (E.D. Cal. Jan. 30, 2012) ("[T]he incontestable status of the 855 Registration does not establish that the

14 broader 1800 trade dress, as defined, is inherently distinctive, because the Proximo plaintiffs cannot

15 separate out and rely on only one incontestable element of the whole.").

16        Plaintiff argues in its motion that in addition to the issued registration for its logo, Plaintiff has

17 "filed for federal registration of its COMPHY mark."  Mot. at 7.  "While plaintiff may have a 'pending'

18 trademark application for the [COMPHY] mark, this does not entitle it to any statutory presumption of

19 ownership, validity, or the exclusive right to use the mark in commerce."  *Pollution Denim & Co. v.*

20 *Pollution Clothing Co.*, 547 F. Supp. 2d 1132, 1139 (C.D. Cal. 2007) (denying preliminary injunction).

21 Thus, Plaintiff enjoys no presumption of secondary meaning in anything but its stylized logo, which

22 Plaintiff does not allege was used.  In order to establish that Plaintiff has a protectable ownership interest

23 in the mark, Plaintiff must come forward with evidence showing that the mark is one protected by the

24 trademark laws.

25              **b.    The claimed trademark is descriptive since Plaintiff's bedsheets are, in
                       fact, comfy (or "comphy").**

26

27        Plaintiff's claimed mark COMPHY is highly descriptive, since it recites one positive quality of

28 Plaintiff's goods—that they are, in fact, comfy.  Such "[l]audatory marks that describe the alleged merit

Davis Wright Tremaine LLP, 1201 Third Avenue, Ste. 2200,
                                                   Seattle, WA  98101, (206) 622-3150· Fax: (206) 757-7700

of the goods are descriptive because they simply describe the characteristics or quality of the goods in a condensed form." *In re Nett Designs, Inc.*, 236 F.3d 1339, 1341 (Fed. Cir. 2001).  Plaintiff's personnel confirm that the word "comfy" means "comfortable," and that Plaintiff's sheets are comfortable.  Gratz Decl., Ex. D ("Zalman Winters Dep. Tr.") at 62:24-63:8; Richardson Dep. Tr. at 79:8-18.  Indeed, Plaintiff touts its sheets in interviews as "the most comfortable sheets."  Richardson Dep. Tr. at 146:15-147:11.

That Plaintiff chose to misspell the word "comfy" as "comphy" does not affect this analysis. People commonly misspell "comfy" as "comphy" in contexts that have nothing to do with Plaintiff.  To demonstrate this, Amazon has conducted a search of all product reviews for the word "comphy."  Out of 2,520 reviews using the word "comphy," only 227 have to do with bedding at all, and only 35 appear to be referring to Plaintiff.  Wilber Decl. Ex. A.[1]  Stated differently, when someone uses the word "comphy" in a review on Amazon, they are using it as a normal English word 98.7% of the time, and they are using it as a source identifier 1.3% of the time.[2]  This natural experiment shows that the primary significance of the word "comphy" is not "to identify the source of the product," *Inwood Labs*, 456 U.S. at 851, but instead to convey a synonym for "comfy" or "comfortable."

And, even if "comphy" were an unusual or uncommon misspelling of the descriptive term "comfy," the trademark laws treat all misspellings of descriptive terms as descriptive marks.  As Learned Hand explained in a seminal 1927 opinion, that is because "a reader who knew how to spell might be in doubt whether the mistake was deliberate," and "one who did not, would be unaware that it was a mistake at all."  *Oakland Chem. Co. v. Bookman*, 22 F.2d 930, 931 (2d Cir. 1927) (Hand, J.).  Indeed, misspelled laudatory terms similar to COMPHY have been held descriptive in a number of past cases.

---

[1] Wilber Decl. Ex. 1 at lines 1-2520 (reproducing 2,520 reviews containing the word "comphy"), lines 2294-2520 (reproducing 227 reviews containing the word "comphy" that relate to bedding), lines 2486-2520 (reproducing 35 reviews containing the word "comphy" that appear to be referring to Plaintiff).

[2] Notably, many of those 1.3% are simply comparative references to Plaintiff.  *See, e.g.*, Wilber Decl. Ex. 1 at line 2487 ("My favorite sheets are from Comphy Co but they are three times more expensive than these."), line 2496 ("I purchased these as an alternative to the more expensive Comphy brand."), line 2501 ("We previously had been using Comphy Company high end microfiber sheets we found during a B&B stay. These are just as soft with a bit more silkier feel.")

1    *See, e.g.*, *In Re Hunke & Jochheim*, 185 U.S.P.Q. (BNA) 188, 1975 WL 20781, at *3 (T.T.A.B. Jan. 16,

2    1975) (DURABUL held descriptive for record books despite misspelling); *C-Thru Ruler Co. v.*

3    *Needleman*, No. 74-2019, 1976 WL 21018, at *9 (E.D. Pa. Feb. 25, 1976) (C-THRU held descriptive for

4    transparent rulers despite misspelling).

5              c.    **Survey evidence shows that the term COMPHY lacks secondary
                     meaning among the relevant consumers.**

6

7              Because it is descriptive of Plaintiff's goods (and is therefore not inherently distinctive), the mark

8    COMPHY is a valid trademark only if it has "secondary meaning."  *See Fleischer Studios, Inc. v.*

9    *A.V.E.L.A., Inc.*, 654 F.3d 958, 967 (9th Cir. 2011).  "The basic element of secondary meaning is . . . the

10   mental association by a substantial segment of consumers and potential consumers between the alleged

11   mark and a single source of the product."  *Levi Strauss & Co.*, 778 F.2d at 1354 (internal quotation marks

12   and citation omitted).  If a substantial segment of consumers associates a descriptive term with a single

13   company, the term has secondary meaning, and that company has trademark rights in that term.  On the

14   other hand, if only "a sparseness of people" associate the mark with a single source, the term lacks

15   secondary meaning.  *Norm Thompson Outfitters, Inc. v. Gen. Motors Corp.*, 448 F.2d 1293, 1297 (9th

16   Cir. 1971).

17             "An expert survey of purchasers can provide the most persuasive evidence on secondary

18   meaning."  *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989).  Amazon

19   commissioned survey expert Hal Poret to design and conduct a study to determine whether the terms

20   COMPHY or COMFY have acquired secondary meaning in connection with bedding products.  The

21   survey is described in detail in the Expert Report of Hal Poret.  *See* Declaration of Hal Poret submitted

22   herewith, Ex. 1 ("Poret Report").  The survey compared the percentage of consumers of luxury bedding

23   who regard the term COMPHY as identifying a particular source of bedding products against a control

24   group asked whether they regard the non-existent brand COMFORT as identifying a particular source of

25   bedding products.[3]

26   _____

27   [3] Plaintiff's CEO confirmed that COMFORT is not a brand name for bedding.  Richardson Dep. Tr. at
     61:24-62:7.  Thus, it is an appropriate control group with which to establish the level of survey "noise,"
28   which is subtracted from the absolute response level.  Poret Report at 10.  *See also* Shari Seidman

The survey results show that the term COMPHY lacks secondary meaning.  The survey found that only 13% of the consumers in the COMPHY test group said that they regarded the term COMPHY as identifying a particular source for bedding—and virtually all of that was survey noise, since 12.5% of the consumers asked about the non-existent brand COMFORT said that *it* identified a particular source for bedding.  Thus, the net level of recognition of the term COMPHY as identifying a particular source for bedding was **0.5%**.

Courts routinely hold that much higher levels of association than a net association of 0.5% still fail to show secondary meaning.  *See, e.g.*, *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 533 F. Supp. 75, 81 (S.D. Fla. 1981) (2.7% association insufficient for secondary meaning); *Citizens Banking Corp. v. Citizens Fin. Grp., Inc.*, No. 07-11514, 2008 WL 1995104, at *5 (E.D. Mich. May 6, 2008) (8% association insufficient for secondary meaning); *Ashland Oil, Inc. v. Olymco, Inc.*, No. 94-5520, 1995 WL 499466, at *4 (6th Cir. Aug. 21, 1995) (8% association insufficient for secondary meaning); *Roselux Chem. Co. v. Parsons Ammonia Co.*, 299 F.2d 855, 862 (C.C.P.A. 1962) (10% association insufficient for secondary meaning); *Zippo Mfg. Co. v. Rogers Imports, Inc.*, 216 F. Supp. 670, 689 (S.D.N.Y. 1963) (25% absolute level of association insufficient for secondary meaning where control group showed 24.1% noise level).

Plaintiff, for its part, has chosen not to conduct a survey.  "[A] plaintiff's failure to conduct a consumer survey, assuming it has the financial resources to do so, may lead to an inference that the results of such a survey would be unfavorable."  *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1041 (C.D. Cal. 1998) (denying preliminary injunction).  Perhaps at some later point in the litigation, Plaintiff will choose to conduct a survey that it will present in an attempt to show that consumers regard COMPHY as an identifier of a single source of bedding products.  But at this stage, Amazon's survey stands alone, and shows unambiguously that COMPHY lacks secondary meaning.

---

Diamond, Reference Guide on Survey Research, *in* FEDERAL JUDICIAL CENTER REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 359, 399 (3d ed. 2011) ("Thus, the focus on the response level in a control group design is not on the absolute response level, but on the difference between the response level of the experimental group and that of the control group."); *AMID, Inc. v. Medic Alert Found. United States, Inc.*, 241 F. Supp. 3d 788, 814 (S.D. Tex. 2017) (subtracting survey noise established using control group from level of association in a secondary meaning survey).

1    The Court's analysis can end here.  "To prevail on a claim of trademark infringement under the

2    Lanham Act, 15 U.S.C. § 1114, a plaintiff must prove:  (1) it has a protectable ownership interest in the

3    mark, and (2) defendant's use of the mark is likely to cause consumer confusion."  *Nordstrom*, 2013 WL

4    1196948, at *2.  Plaintiff's claim fails at the first step of that analysis, because Plaintiff lacks any

5    protectable ownership interest in the mark COMPHY—an unregistered, descriptive mark that lacks the

6    necessary secondary meaning to be protectable as a trademark.  This motion can be denied on that basis

7    alone.

8    　　　　　　　　**2.    The evidence of actual confusion is limited to consumers who purchased
         COMFY sheets but intended to buy COMPHY sheets, and Plaintiff accepted**
9    **         the risk of such confusion when it chose a common misspelling of a**
        **         descriptive word as its brand name.**
10

11    Plaintiff has come forward with some evidence of actual confusion.  While the third-party seller

12   who markets its "Comfy Sheets" brand on Amazon has processed ███ orders for "Comfy Sheets" on

13   Amazon.com, Wilber Decl. ¶ 11, only 24 such purchasers have complained, either in Amazon reviews or

14   to Plaintiff.[4]  In other words, the evidence suggests that for every order of "Comfy Sheets" that gave rise

15   to a complaint about confusion, there were ███ other orders that did not; ███% of consumers of "Comfy

16   Sheets" gave no indication they were confused.

17    Notably, the *only* actual confusion claimed by Plaintiff relates to "Comfy Sheets"—not to any

18   other product sold on Amazon.  Gratz Decl., Ex. E ("Jeffcoat Dep. Tr.") at 87:24-88:19.  Thus, as

19   discussed below, to the extent the Court concludes that this motion presents a problem that needs to be

20   addressed, any order should be limited to directing the removal of "Comfy Sheets" branded items from

21   Amazon, rather than any broader relief.

22    But the presence of a small amount of confusion, adding up to a fraction of a percent of all

23   purchasers, does not mean that there is a problem here that the trademark laws need to solve.  The

24   trademark laws tolerate "a certain degree of confusion on the part of consumers," especially where "an

25

26   ─────────────────
     [4] Wilber Decl. Ex. 1 at lines 2553-2567 (reproducing 14 reviews); Dkt. # 40-01 at pp. 2, 7, 10, 14, 15, 17,
27   23, 28, 30; Dkt. # 42 (reproducing contacts with 10 customers).  Indeed, this likely overstates matters;
     some of the 14 consumers who left reviews on "Comfy Sheets" on Amazon may have been the same 10
28   consumers who contacted Plaintiff having purchased "Comfy Sheets."

originally descriptive term was selected to be used as a mark . . . ."  *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004).  "If any confusion results, that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well known descriptive phrase."  *Id.* (quoting *Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997)).  Plaintiff chose to adopt COMPHY as its brand name in part because "it sounds like the word 'comfy.'"  Richardson Dep. Tr. at 62:24-63:13.  The price of that choice is a small amount of confusion—and that is the price Plaintiff is paying here.

### 3.    The target consumers are different, since Plaintiff targets only those who have slept on its bedsheets at particular hotels and bed-and-breakfasts, and Defendant targets all consumers of bedsheets.

Plaintiff's target market segment for its retail business (as opposed to its much larger wholesale business, which is not at issue in this case) is extremely narrow:  Plaintiff does not "do any marketing into the large luxury linen market," but instead has "always marketed through [its] wholesale customers and the experience or word of mouth."  Richardson Dep. Tr. at 130:3-16.  In other words, as Plaintiff confirms in its brief, Plaintiff's target consumers are those who are affirmatively "seeking genuine Comphy Sheets after having experienced the Comphy Sheets at a high-end spa or hotel."  Mot. at 16.

Amazon, by contrast, does not limit its sales to those who have stayed at particular bed-and-breakfasts.  *See* Amazon 2017 10-K at 3 ("We design our websites to enable hundreds of millions of unique products to be sold by us and by third parties across dozens of product categories.").  Indeed, Plaintiff's CEO accurately described some of the key differences between Plaintiff's target customers and Amazon's, referring to "[t]hat Amazon shopper looking for a good deal and free shipping," Richardson Dep. Tr. at 136:15-19—people to whom Plaintiff makes no effort to market.

### 4.    Consumers of luxury bed sheets exercise a reasonable degree of care.

With respect to the degree of care exercised by the group of consumers in question, Plaintiff relies entirely on *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199 (9th Cir.2000), which Plaintiff contends stands for the proposition that "Web users" in general exhibit a uniform low degree of care.  Mot. at 14.  Accepting this argument would be reversible error, as the Ninth Circuit explained in *Network Automation, Inc.*, 638 F.3d at 1153.  There, the Ninth Circuit reversed a district court's order granting a preliminary injunction, holding that "the district court improperly concluded that this factor weighed in

[Plaintiff's] favor based on a conclusion reached by our court more than a decade ago in *Brookfield* and *GoTo.com* that Internet users on the whole exercise a low degree of care." *Id.* "While the statement may have been accurate then, we suspect that there are many contexts in which it no longer holds true." *Id.* The sheets in question here are not an impulse purchase; they cost more than a hundred dollars. In fact, "the relevant consumer is a reasonably prudent consumer accustomed to shopping online; the kind of consumer who is likely to visit the [defendant's] website when shopping for an expensive product like a luxury [bedsheet set]." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1176 (9th Cir. 2010).

It is true that a small group of consumers apparently did not exercise the degree of care necessary to notice that "Comfy Sheets" were not the "Comphy" sheets they were looking for. But when one is shopping for a particular brand of sheets by a descriptive brand name, prudence requires checking to make sure the brand name is (mis)spelled correctly. "Unreasonable, imprudent and inexperienced web-shoppers are not relevant." *Id*. at 1176. The fraction of a percent of those shopping specifically for COMPHY sheets who didn't notice that they were instead buying "Comfy Sheets" fall into that category. Accordingly, the degree of care exercised by the relevant consumers does not weigh in favor of a finding of likelihood of confusion.

> **5.** **There is no evidence that Amazon intended to confuse consumers, only that Amazon offered competing products to consumers who search for Plaintiff's products.**

There is no evidence that Amazon intended that consumers purchase third parties' bedsheets believing themselves to be purchasing Plaintiff's bedsheets. Instead, the evidence reflects that Amazon shoppers who were shopping for Plaintiff's sheets decided to purchase different sheets instead. For example, as one consumer review posted on Amazon for a set of Nouvelle Legende sheets recounts:

> I was looking to buy genuine Comphy sheets when I came across this set on Amazon. These are indeed very nice sheets. Perhaps not as silky as the Comphy sheets, but smooth and silky enough to please me. The real value lies in the price, which is half what the Comphy sheets sell for.

Wilber Decl. Ex. A at line 2488. Or, as another Mellanni consumer said in a review:

> I purchased these as an alternative to the more expensive Comphy brand. At first I was concerned that the quality was not so great; the weight of the fabric is much less substantial than Comphy. But they came through the first washing just fine, they fit the mattress well, and are super soft and comfortable.

1    *Id.* at line 2496.  *See also, e.g.*, *id.* at line 2504 ("They're not expensive, and I was trying them as I hoped

2    they would serve as a replacement for the Comphy brand spa sheet sets that we prefer (but that are five

3    times the cost)."); *id.* at line 2508 ("I ordered the charcoal gray color in the Twin XL size and am trying

4    these as a spare set instead of the Comphy brand microfiber spa sheets that we've used for the last five or

5    six years (but that are five times the price)."); *id.* at line 2490 ("I wanted to find a cost effective

6    equivalent to these $150 Comphy sheets I slept on at a bed and breakfast and these came highly

7    recommended through reviews."); *id.* at line 2507 ("I have slept on the 'Comphy' brand at a resort. These

8    are so close that it is hard to tell the difference other than the price. I would STRONGLY recomend [sic]

9    anyone trying to decide between the two to get these and save the money!"); *id.* at line 2505 ("I have just

10   slept on comphy sheets at a B&B and these are comparable to them at about a third of the cost.").

11        Selling bedsheets to consumers who shop around for a better value does not reflect an intent to

12   mislead consumers; instead, as the Ninth Circuit has held, it reflects a lawful intent to "truthfully inform

13   them of their choice of products."  *Network Automation, Inc*., 638 F.3d at 1153.  Thus, this factor does

14   not weigh in favor of a finding of likelihood of confusion.

15   ### C.    The Comphy Company is not likely to succeed on the merits of its contributory-infringement claim.

16

17        Plaintiff argues that, in addition to being liable as a direct trademark infringer, Amazon is liable

18   as a contributory infringer, for having "continue[d] to supply a product knowing that the recipient is

19   using the product to engage in trademark infringement."  *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d

20   259, 264 (9th Cir. 1996); Mot. at 16.  There are two principal problems with this claim.

21        *First*, a claim for contributory trademark infringement requires a showing that a third party is a

22   direct infringer of Plaintiff's rights.  But as discussed above, Plaintiff lacks trademark rights in

23   COMPHY that would support a claim of infringement even against the third party who sells "Comfy

24   Sheets" on Amazon.  Since there is no actionable direct infringement, there can be no contributory

25   liability.

26        *Second*, Amazon had and has no knowledge that the seller of "Comfy Sheets" is violating

27   Plaintiff's trademark rights in the term COMPHY.  That is because, as discussed above, Amazon

28   reasonably believes that Plaintiff lacks any trademark rights in the term COMPHY, which is a descriptive

term lacking in secondary meaning.  Merely knowing that Plaintiff existed is not enough; Plaintiff would need to show that Amazon continued to supply its services to the seller of "Comphy Sheets" knowing that those sheets infringed Plaintiff's legitimate rights.  There is no evidence of that, and indeed Amazon's view that Plaintiff lacks rights in the mark COMPHY has been further strengthened by the results of the secondary-meaning survey conducted in connection with this motion.

## IV.   PLAINTIFF HAS NOT ESTABLISHED IRREPARABLE HARM OR THE OTHER NECESSARY ELEMENTS FOR A GRANT OF PRELIMINARY INJUNCTION

### A.   The Comphy Company has not met its burden to show a likelihood of irreparable harm.

There is no longer any presumption of irreparable harm in trademark cases, even upon a showing of likelihood of success on the merits.  Instead, "a plaintiff must establish irreparable harm [in order to receive] a preliminary injunction in a trademark infringement case."  *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013).  The Comphy Company has failed to do so here, for two key reasons discussed below:  because Plaintiff knew about the facts underlying its claim for *more than three years* before filing this case, and because Plaintiff admits that the harm it is suffering will be compensable with money damages if Plaintiff is successful at trial.

### 1.   There is no emergency justifying a preliminary injunction.

#### a.   Plaintiff has known about the facts underlying this motion since at least May 31, 2015.

"A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights."  *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (citation omitted).  For that reason, a plaintiff's "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."  *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

Here, Plaintiff's own documents show that Plaintiff has known about the key facts underlying this motion since at least May 31, 2015—more than three years before this case was filed.  In her deposition, Plaintiff's CEO was presented with a screenshot taken on May 31, 2015 showing an Amazon.com search for "comphy co sheets."  Three brands of sheets are offered in response to the search, but none of them are Plaintiff's sheets.  Plaintiff's CEO confirmed that she herself took this screenshot on May 31, 2015

1   and circulated it within the company. Richardson Dep. Tr. at 12:19-20:9. And she confirmed that

2   Plaintiff raised no objection to the results as shown in that screenshot at that time. *Id*. at 20:10-16. To

3   the extent Plaintiff's claim rests on Amazon's provision of competing products in response to a search

4   for Plaintiff's company name, Plaintiff was on notice of that claim more than three years before the case

5   was filed, and such a long delay "implies a lack of urgency and irreparable harm" necessary for issuance

6   of a preliminary injunction. *Oakland Tribune, Inc.*, 762 F.2d at 1377.

7         In discussing the screenshot in her deposition, Plaintiff's CEO identified two issues present in this

8   motion that do not appear on the face of the screenshot: Amazon's practice of running Google AdWords

9   advertisements seeking to sell competing goods to those searching for Plaintiff's products, and the

10  presence of the third-party "Comfy Sheets" on Amazon's site. Richardson Dep. Tr. 17:6-18:4. But

11  neither of those is a recent development, either. Plaintiff knew about Amazon's Google AdWords

12  advertisements at least by September 10, 2015, when Plaintiff wrote to Google (but not Amazon)

13  regarding Amazon's advertisements on Google seeking to sell competing sheets to those searching for

14  Plaintiff's name. Richardson Dep. Tr. at 21:10-28:8 & Gratz Decl. Ex. F ("Richardson Dep. Ex. 4"). So

15  even if Plaintiff did not know about Amazon's search advertising as of May 31, 2015, Plaintiff certainly

16  knew about that advertising as of September 10, 2015, more than three years ago.

17        Nor is the presence of "Comfy Sheets" of particularly recent vintage. Plaintiff was on notice of

18  the presence of those third-party items on Amazon.com at least as early as April 5, 2017, when an

19  internal email thread indicates that Molly Zalman Winters, the person at The Comphy Company in

20  charge of trademark matters, received notice of those items. Gratz Decl. Ex. G ("Zalman Winters Dep.

21  Ex. 6") & Zalman Winters Dep. Tr. at 57:13-59:5. Far from taking immediate action, Ms. Zalman

22  Winters was of the view that "it looks like they aren't doing anything wrong" because "it's all coming up

23  under 'comfy.'" Zalman Winters Dep. Ex. 6 at COMPHY000154.

24        Thus, even assuming that Plaintiff needed to wait until all of the facts had come in before taking

25  action, Plaintiff was aware of all of the facts underlying its motion no later than April 5, 2017, and waited

26  at least one year and four months before filing its motion for preliminary injunction. Shorter delays have

27  been found to weigh against issuance of a preliminary injunction. *See, e.g.*, *Studio Red Inc. v. Rockwell*

28  *Architecture Planning & Design, P.C.*, No. C 07-396 CW, 2007 WL 1462458, at *4 (N.D. Cal. May 18,

1   2007) (denying preliminary injunction after delay of eight months); *Spiraledge, Inc. v. SeaWorld Entm't,*

2   *Inc.*, 109 U.S.P.Q.2d 1774, 1779, 2013 WL 3467435 (S.D. Cal. July 9, 2013) (denying preliminary

3   injunction because 13 month delay negated irreparable injury).

4       Accordingly, Plaintiff's delay weighs against a finding of irreparable harm and issuance of a

5   preliminary injunction.

6             **b.**      **The magnitude of this issue has remained constant for more than a**

7                     **year.**

8       Plaintiff attempts to justify seeking a preliminary injunction by saying in its CEO's declaration

9   that there is a "suddenly increasing threat to the Comphy brand." Richardson Aff. ¶ 27. But in fact,

10  Plaintiff's employee responsible for communicating with retail customers testified that the rate at which

11  customers contact Plaintiff about sheets that turn out to have been made by "Comfy Sheets" has

12  remained constant since early 2018, and have remained steady, accounting for seasonal changes in the

13  retail industry, since that employee started working for Plaintiff. Jeffcoat Dep. Tr. at 32:10-14. The

14  present status quo has been unchanged for more than a year, and there is no evidence of a new, sudden,

15  or impending threat to Plaintiff.

16            **2.**      **The claimed harm is compensable in damages.**

17      In order to receive a preliminary injunction, Plaintiff must show, in addition to the other elements,

18  that "it is likely to suffer irreparable harm in the absence of preliminary relief." *Herb Reed Enters., LLC*,

19  736 F.3d at 1247. "Purely monetary injuries are not normally considered irreparable." *Lydo Enters.,*

20  *Inc.*, 745 F.2d at 1213. "Mere injuries, however substantial, in terms of money, time and energy

21  necessarily expended in the absence" of a preliminary injunction are not enough. *Sampson v. Murray*,

22  415 U.S. 61, 90 (1974) (quoting *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d

23  921, 925 (D.C. Cir. 1958)). "The possibility that adequate compensatory or other corrective relief will be

24  available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable

25  harm." *Id.* Here, two facts confirm that the claimed harm is compensable in money damages.

26      *First*, Plaintiff's CEO estimated in deposition that the annual amount by which net sales were

27  affected as a result of the challenged conduct was a number "███████████████" Richardson Dep. Tr. at

28  96:22-97:3; *see id.* at 95:11-97:14 (discussing the effect of the challenged conduct on net sales). No

1    matter what number "████████████" may be arrived at by the jury if Plaintiff is ultimately successful

2    in pressing its claims, Amazon will be able to pay that figure.

3            *Second*, the Plaintiff's claim of urgency arises out of its view that Plaintiff "will not meet its 2018

4    budget if this situation is not remedied immediately."  Mot. at 18.  Plaintiff claims that this "shortfall

5    with the projected growth" is the result of Amazon's conduct.  Mot. at 17.  Specifically, Plaintiff expects

6    that if a preliminary injunction does *not* issue, its retail sales will grow by 24.2% in 2018 over 2017.

7    Richardson Dep. Tr. at 98:11-18; Richardson Aff. ¶ 29.  Plaintiff regards this extraordinarily high rate of

8    growth as evidence of harm, however, since Plaintiff had hoped that retail sales would instead grow by

9    approximately 34% in 2018 over 2017.  *Id.*; *see* Mot. at 19.  But even to the extent year-over-year growth

10   of 24.2% can be regarded as harm, it is not *irreparable* harm, because we can calculate the amount of

11   money Amazon would need to pay if Plaintiff were ultimately to be successful.  According to Plaintiff's

12   CEO's declaration, web retail sales in 2017 totaled $████████  Richardson Aff. ¶ 18.  Growth at

13   Plaintiff's hoped-for 34% rate would lead to sales in 2018 of $████████████  Richardson Aff. ¶ 18.  If a

14   preliminary injunction does not issue and growth instead occurs at Plaintiff's expected rate of 24.2%, that

15   would lead to sales in 2018 of $████████ a shortfall of $████████  If Plaintiff were ultimately successful

16   in proving that some wrongful conduct by Amazon resulted in damage in that amount, Amazon would be

17   able to pay that figure, as well.

18           Accordingly, because Plaintiff has not demonstrated a need for immediate injunctive relief—both

19   because Plaintiff has known about the facts underlying its claim for years and because the claimed harm

20   would be compensable with money damages—the motion for preliminary injunction should be denied.

21       **B.      The balancing of the equities does not favor issuance of a preliminary injunction.**

22           Plaintiff's sole argument that the balancing of the equities favors issuance of a preliminary

23   injunction is the argument that Amazon is a very large company, while Plaintiff is a smaller company.

24   Mot. at 20.  But as discussed above with respect to the lack of irreparable harm, there is no claim that

25   Plaintiff will suffer anything other than the temporary loss of money, which Amazon can pay in the event

26   (unlikely, in Amazon's view) that Plaintiff is ultimately successful at trial.  Thus, because there is no

27   existential or lasting threat to either party, the balancing of the equities tilts neither in favor of nor against

28   issuance of a preliminary injunction.

1

2

**C.   The proposed preliminary injunction is vague and overbroad, and the public interest would be disserved by the grant of an injunction**

3

Plaintiff's proposed preliminary injunction is vague, overbroad, and inconsistent with the Ninth

4

Circuit's holding in *Multi Time Machine*.  As discussed above, Plaintiff distinguishes that case only by

5

arguing that the presence of the "Comfy Sheets" brand runs afoul of the trademark laws notwithstanding

6

*Multi Time Machine*.  Mot. at 8-9.  Amazon does not believe that Plaintiff's trademark rights are strong

7

enough to prevent another company from calling their comfy sheets Comfy Sheets—as borne out by the

8

survey evidence and reviews discussed above.  But if this Court disagrees and believes that Plaintiff has

9

met its burden to show that COMPHY has gained secondary meaning among a substantial segment of

10

consumers and that "Comfy Sheets" are likely to be found to infringe Plaintiff's trademark rights, any

11

injunction should be limited in scope to require only the removal of the "Comfy Sheets" brand from sale

12

during the pendency of this litigation.  But when someone comes to Amazon looking for Plaintiff's

13

sheets, Amazon should be able to try, if it can, to sell them clearly-labelled HC Collection sheets, or

14

Mellanni sheets, or Urbanhut sheets, or Nouvelle Legende sheets, or even AmazonBasics sheets instead

15

of Plaintiff's sheets.

16

**V.   CONCLUSION**

17

For the foregoing reasons, Plaintiff has not met its burden to show a likelihood of success on the

18

merits or a probability of irreparable harm.  The motion for preliminary injunction should be denied.

19

Dated: October 29, 2018

20

Bonnie MacNaughton, WSBA #36110
bonniemacnaughton@dwt.com
James Harlan Corning, WSBA #45177
jamescorning@dwt.com
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045
Telephone:     (206) 622-3150
Facsimile:     (206) 757-7700

21

22

23

24

25

Joseph C. Gratz (*pro hac vice*)
jgratz@durietangri.com
Vera Ranieri (*pro hac vice*)
vranieri@durietangri.com
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111

26

27

28

Telephone:      (415) 362-6666
Facsimile:      (415) 236-6300

Attorneys for Defendant
AMAZON.COM, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to those attorneys of record registered on the CM/ECF system. All other parties (if any) shall be served in accordance with the Federal Rules of Civil Procedure

Dated this 29th day of October, 2018.

*/s/ Bonnie MacNaughton*
Bonnie MacNaughton, WSBA #36110

CERTIFICATE OF SERVICE - 1
CASE NO. 2:18-CV-01460-RSM