1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9         FOR THE WESTERN DISTRICT OF WASHINGTON

10                    AT SEATTLE

11   THE COMPHY CO.,                          Case No. 2:18-cv-01460-RSM

12                        Plaintiff,          **DECLARATION OF HAL PORET IN**
                                              **SUPPORT OF OPPOSITION TO PLAINTIFF**
13        v.                                  **THE COMPHY CO.'S SECOND AMENDED**
                                              **MOTION FOR PRELIMINARY**
14   AMAZON.COM, INC.,                        **INJUNCTION**

15                        Defendant.          NOTE ON MOTION CALENDAR:
                                              NOVEMBER 2, 2018
16
                                              Suite:   13206
17                                            Judge:   Honorable Ricardo S. Martinez

18

19

20

21

22

23

24

25

26

27

28

1    I, Hal Poret, declare as follows:

2    I am president at Hal Poret, LLC.  If called upon to testify, I would testify competently to the

3    matters set forth herein.

4        1.        Through its attorneys, Durie Tangri LLP, Amazon.com, Inc. retained me to design and

5    conduct a survey to assess whether the terms COMPHY or COMFY have acquired secondary meaning in

6    connection with bedding products.

7        2.        Attached hereto as Exhibit 1 is a true and correct copy of my survey report.

8    I declare under penalty of perjury that the foregoing is true and correct.

9    Executed on 10-24 , 2018 at Norfo/c, Virginia .

10

11    _____

12                                            Hal Poret

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on October 29, 2018, I electronically filed the foregoing with the Clerk

3    of the Court using the CM/ECF system, which will send notification of such filing to those

4    attorneys of record registered on the CM/ECF system. All other parties (if any) shall be served in

5    accordance with the Federal Rules of Civil Procedure

6          Dated this 29th day of October, 2018.

7

8                                                      */s/ Bonnie MacNaughton*
                                                      Bonnie MacNaughton, WSBA #36110

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CERTIFICATE OF SERVICE - 1
CASE NO. 2:18-CV-01460-RSM

# EXHIBIT 1

**EXPERT REPORT OF HAL PORET IN MATTER OF
THE COMPHY CO. V. AMAZON.COM, INC.**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**SURVEYS TO ASSESS WHETHER THE TERMS COMPHY OR COMFY
HAVE ACQUIRED SECONDARY MEANING
IN CONNECTION WITH BEDDING PRODUCTS**

PREPARED BY:
Hal Poret
President, Hal Poret LLC
142 Hunter Ave
Sleepy Hollow, NY 10591


October 2018

## *TABLE OF CONTENTS*

Page #

BACKGROUND AND PURPOSE -------------------------------------------------- 3
STUDY AUTHORSHIP AND QUALIFICATIONS-------------------------- 5
STUDY DESIGN------------------------------------------------------------------------ 6
SUMMARY OF FINDINGS --------------------------------------------------------- 12
METHODOLOGY----------------------------------------------------------------------- 13
    THE RELEVANT UNIVERSE OF INTEREST ------------------------ 13
    SAMPLING PLAN----------------------------------------------------------- 18
    DATA PROCESSING -------------------------------------------------------- 22
    INTERVIEWING PROCEDURES----------------------------------------- 22
    DOUBLE-BLIND INTERVIEWING ------------------------------------- 22
    INTERVIEWING PERIOD--------------------------------------------------- 22
    QUALITY CONTROL -------------------------------------------------------- 23
DETAILED FINDINGS ----------------------------------------------------------------- 24

THE FOLLOWING APPENDICES ARE PROVIDED SEPARATELY:
APPENDIX A:   CURRICULUM VITAE OF STUDY'S AUTHOR
APPENDIX B:   QUESTIONNAIRE
APPENDIX C:   SCREENSHOTS OF SURVEY
APPENDIX D:   SURVEY DATA FILE

## BACKGROUND AND PURPOSE

The Comphy Co. sells a variety of bedding products, including sheets, pillow cases, pillows and blankets/comforters, among other bedding and linen items.  The Comphy Co. uses the term COMPHY in connection with its products, including through its website at www.comphy.com.

The Comphy Co. has filed a lawsuit against Amazon.com, Inc. (Amazon) arising out of Amazon's presentation of listings for various bedding products in response to consumer searches using the term COMPHY, some of which listings include use of the term COMFY.  The Comphy Co. alleges that it has rights in the mark COMPHY (as well as other marks including the term COMPHY).  It is also my understanding that consumers sometimes use the misspelling COMFY with the intention of finding products from The Comphy Co.

In connection with this lawsuit, counsel for Amazon has retained me to design and conduct a study to determine whether the terms COMPHY or COMFY have acquired secondary meaning in connection with bedding products – i.e., whether these terms identify a single source of bedding products in the perceptions of relevant consumers.  Because The Comphy Co. characterizes itself as selling "high end" or "luxury" products, I conducted the survey specifically among the segment of bedding purchasers who are actual and prospective purchasers of bedding products in the higher price ranges charged by The Comphy Co. for its products.  This ensured that the survey would measure any rate of association of the relevant terms with The Comphy Co. among the specific segment of bedding consumers who are most likely to have developed awareness of The Comphy Co. or its products.  As discussed in more detail below, the survey found a very low rate of association of the terms COMPHY or COMFY with a single source, indicating that these terms have not acquired secondary

meaning, even among the specific subset of bedding consumers who purchase bedding products in the higher price ranges characteristic of The Comphy Co. products.

In the course of designing my surveys and preparing this report, I reviewed the following materials: (1) Complaint; (2) The Comphy Co. website (comphy.com); (3) Amazon.com.  I also conducted various online searches for the terms COMPHY and COMFY and for other terms that may be used generically or descriptively in connection with bedding products (such as COMFORT) and examined the results of such searches.

The fee charged for my work on this matter through the design and completion of the survey and this report is $50,000.  Any additional work in connection with this matter is being charged at my standard rate of $675 per hour.  Payment is not contingent upon the nature of my opinions or the outcome of any proceeding.

## STUDY AUTHORSHIP AND QUALIFICATIONS

This study was designed, supervised, and implemented by Hal L. Poret, President at Hal Poret, LLC.

I have personally designed, supervised, and implemented over 1,000 surveys regarding the perceptions and opinions of consumers.  Over 300 have involved consumer perception with respect to trademarks, and over 500 have been conducted online.  I have personally designed numerous studies that have been admitted as evidence in legal proceedings and I have been accepted as an expert in survey research on numerous occasions by U.S. District Courts, the Trademark Trial and Appeal Board, and the National Advertising Division of the Council of Better Business Bureaus (NAD).

I am a member of the American Association of Public Opinion Research, publisher of *Public Opinion Quarterly* and the *Journal of Survey Statistics and Methodology*; the International Trademark Association; and the National Advertising Division of the Council of Better Business Bureaus (NAD).  I routinely conduct market research surveys for a variety of small to large corporations and organizations.

I have frequently spoken at major intellectual property and legal conferences on the topic of how to design and conduct surveys that meet legal evidentiary standards for reliability, including conferences held by the International Trademark Association (INTA), American Intellectual Property Law Association, Practicing Law Institute, Managing Intellectual Property, Promotions Marketing Association, American Conference Institute, and various bar organizations.

In addition to my survey research experience, I hold bachelors and masters degrees in mathematics and a J.D. from Harvard Law School.  Additional biographical material, including lists of testimony and publications, is provided in Appendix A.

## *STUDY DESIGN*

A total of 600 respondents participated in this online survey among consumers of high-end bedding products (sheets, pillowcases, pillows, blankets/comforters, etc).[1]

The survey followed a standard format for measuring secondary meaning in which respondents were shown a mark and were then asked a series of questions to assess whether or not they associate the mark with a single source and, if so, which source.

The survey was composed of two Test Groups and one corresponding Control Group, each comprised of 200 unique respondents.

The sole difference between each Group was the term shown to respondents.

One Test Group (the "Comphy Test Group") saw the following term at issue:

# COMPHY

A second Test Group (the "Comfy Test Group") saw the following term at issue:

# COMFY

Meanwhile, respondents in the Control Group saw the following control term:

# COMFORT

---

[1] See the Relevant Universe and Sampling section of this report for more information regarding who qualified for and completed the survey.

As discussed in more detail below, the Control Group established a baseline level of survey noise by replacing the marks at issue with a control term that is not associated with only one source.  Specifically, showing a control term –i.e., COMFORT – to a separate Group, controls for any general tendency of consumers to answer that a term in connection with bedding is associated with one source even if the term, in fact, is not associated with only one source.  By measuring this "noise" level and subtracting it from the gross Test Group secondary meaning rates, the survey can measure a "net" secondary meaning level that can be reliably attributable to genuine consumer recognition and association of the term(s) with a single source.

As this was an online survey, all instructions and questions were displayed on respondents' computer screens and each question appeared on its own screen.

<u>Comphy Test Group</u>

First, upon completion of the screening questions, and prior to being shown the mark, all 200 respondents in the Comphy Test Group were prompted as follows:

> On the next screen you will be shown a term that you may or may not have seen or heard before in connection with bedding products, such as sheets, pillowcases, pillows, blankets/comforters, or other bedding.
>
> You will be asked some questions about the term.
>
> For any question, if you have no opinion or do not know, then please indicate so. Please do not guess.

On the next screen, respondents were further instructed and shown the mark at issue:

Have you ever seen or heard the following term before in connection with any bedding product or products?

# COMPHY

*(Select one choice)*

- Yes, I have[2]
- No, I have not
- Not sure/don't know

The mark at issue continued to appear on all subsequent screens.  For a mark to have acquired secondary meaning, it must already be known to the respondent.

All respondents were then asked:

Do you associate the following term with any particular company or companies, or brand or brands, that offer bedding products?

*(Select one choice)*
- Yes, I <u>do</u>[3]
- No, I do <u>not</u>
- Don't know/no opinion

Respondents who answered, "yes, I do," were then asked:

---

[2] To avoid results bias due to response option order, the order in which the first two options appeared was randomized so that half of all respondents saw the options in the order shown here, while half saw the options with, "No, I have not," listed first.
[3] To avoid results bias due to response option order, the order in which the first two options appeared was randomized.

Do you associate the following term with…

*(Select one choice)*

- Only one company or brand that offers bedding products[4]
- More than one company or brand that offers bedding products
- Don't know/no opinion

Respondents who answered "only one company or brand that offers bedding products" were then asked:

**What company or brand** do you associate the following term with?

Respondents could type in any answer or select, "don't know."

Respondents who selected "don't know," were then asked:

What made you answer that you associate the following term with only one company or brand that offers bedding products?

Please be as detailed and specific as you can.

Respondents could type in any answer.

Comfy Test Group

A separate 200 unique respondents participated in the Comfy Test Group. These respondents took a survey identical to those in the Comphy Test Group with the sole exception that in lieu of the term COMPHY they were shown the term COMFY:

---

[4] To avoid results bias due to response option order, the order in which the first two options appeared was randomized.

# COMFY

All other aspects of the survey taken by respondents in the Comfy Test Group were identical to those in the Comphy Test Group, detailed above.

<u>Control Group</u>

As noted above, the survey included a Control Group, comprised of 200 unique respondents.

The purpose of the Control Group is to measure survey noise – i.e., the tendency of respondents to answer that they identify a mark with only one source of bedding for reasons other than genuine recognition of the mark, such as guessing or other forms of survey or respondent error.

The Control Group accounted for survey noise by showing a separate group of respondents a control mark that is not associated with any one source, and then asking the same questions that were asked of the Test Groups.  Since all other aspects of the survey were identical to that of the survey taken by respondents in the Test Groups, any difference between the secondary meaning results in the Test Groups and the noise result of the Control Group can be reliably attributed to actual association of the terms COMPHY and COMFY with one source.

The Control Group took a survey identical to the Test Groups with the sole exception that in lieu of the term COMPHY or COMFY, Control Group respondents were shown the following control term:

# COMFORT

In selecting a control, I sought to identify an alternate term (other than COMPHY or COMFY) that also conveys the concept of bedding being comfortable, but that is <u>not</u> an identifier of a single source.  My online searches, in addition to my previous experience doing consumer research with respect to bedding products, caused me to identify COMFORT as an appropriate control term.  The term COMFORT does not function as a single-source identifier in connection with bedding.  Rather, many different sources use and have used the term COMFORT in connection with bedding products, including in the names of companies/brands (such as Select Comfort, Personal Comfort, Elegant Comfort, Comfort Spaces, and iComfort), in descriptions of bedding products (such as Cozy Fleece Comfort Collection or Serta Comfort Sheet Set), or in slogans (such as The Company Store's "we're all about comfort.").  As detailed further below, the survey data empirically confirms that the term COMFORT is not associated with any one source to any meaningful degree, as no more than a negligible number of respondents named any particular source in connection with the term COMFORT.  The term COMFORT is an ideal control because any rate of respondents indicating that they associate the term COMFORT with <u>only one</u> source of bedding products reflects the level of survey noise, as COMFORT does not actually serve to identify only one source.

Screenshots of the survey are provided in Appendix C.

## *SUMMARY OF KEY FINDINGS*

This section details certain key survey findings.  Other survey results are discussed further in the Detailed Findings section below.

Only 13.0% of respondents answered that they associate the term COMPHY with <u>only one</u> company or brand that offers bedding products.

Only 5.0% of respondents answered that they associate the term COMFY with <u>only one</u> company or brand that offers bedding products.

These are low rates which, on their own, indicate that the terms COMPHY and COMFY have not acquired a substantial degree of secondary meaning in the relevant marketplace.

In the Control Group, 12.5% of respondents answered that they associate the term COMFORT with only one company or brand that offers bedding products.

Since neither the 13.0% or 5.0% results for COMPHY and COMFY respectively exceed the 12.5% noise level by a meaningful margin, the net secondary meaning levels for COMPHY and COMFY are effectively zero.

Based on the survey results, it is my opinion that the terms COMPHY and COMFY have not acquired a substantial degree of secondary meaning in the relevant marketplace.

<u>See</u> Detailed Findings section below for additional information on results.  The full data is provided in its original electronic form in Appendix D.

## *METHODOLOGY*

### THE RELEVANT UNIVERSE OF INTEREST

The appropriate sample universe for this survey consisted of U.S. consumers age 18 and older who have purchased bedding products (bed sheets, pillows, blankets, or other bedding) in the past twelve months in the price ranges of products offered by The Comphy Co., or are likely to consider doing so in the next twelve months.

The following screening questions were employed to ensure the final survey sample was comprised of respondents from the appropriate sample universe.

First, after initial demographic questions, all potential respondents were asked:

> In the past 12 months, which of the following, if any, have you personally purchased?
> *(Select all that apply)*

The following table displays the list of randomized options available from which respondents could select and the proportion of final respondents who selected each:

| Purchased in Past 12 Months | | |
|---|---|---|
| N=600 | N | % |
| Bed sheets, pillows, blankets, or other bedding | 534 | 89.0% |
| Towels, washcloths, bathmats, or other bath sheets | 499 | 83.2% |
| Clothes bins, storage units, hangers, or other organizers | 410 | 68.3% |
| Kitchen blender, processor, crockpot, or other appliance | 363 | 60.5% |
| Desktop, laptop, tablet, or other computer | 322 | 53.7% |
| None of these | 11 | 1.8% |

In addition to bed sheets, pillows, blankets, or other bedding, other response options were included to provide a variety of items from which respondents could select and to mask the key topic of the survey.

Next, all potential respondents were asked:

> In the <u>next</u> 12 months, which of the following, if any, are you likely to consider purchasing?
> *(Select all that apply)*

The following table displays the list of randomized options available from which respondents could select and the proportion of final respondents who selected each:

| Likely to Consider Purchasing in Next 12 Months | | |
|---|---|---|
| N=600 | N | % |
| Bed sheets, pillows, blankets, or other bedding | 469 | 78.2% |
| Towels, washcloths, bathmats, or other bath sheets | 437 | 72.8% |
| Clothes bins, storage units, hangers, or other organizers | 366 | 61.0% |
| Kitchen blender, processor, crockpot, or other appliance | 350 | 58.3% |
| Desktop, laptop, tablet, or other computer | 350 | 58.3% |
| None of these | 33 | 5.5% |

Respondents who answered that they have purchased or are likely to consider purchasing "Bed sheets, pillows, blankets, or other bedding" were then asked a series of questions regarding what price ranges they have paid or would consider paying for various bedding products. First, respondents were asked:

> Which of the following price ranges have you paid or would you consider paying the next time you purchase a <u>set of bed sheets</u>?
> *(Please select all that apply)*

The following table displays the options from which respondents could select and the proportion of final respondents who selected each:

| Have Paid or Would Consider Paying for Bed Sheets | | |
|---|---|---|
| N=600 | N | % |
| Under $75 | 256 | 42.7% |
| $75 to $124.99 | 300 | 50.0% |
| $125 to $174.99 | 197 | 32.8% |
| $175 to $224.99 | 136 | 22.7% |
| $225 to $274.99 | 74 | 12.3% |
| $275 or more | 41 | 6.8% |
| Don't know/not sure | 5 | 0.8% |
| I have not purchased and do not plan to purchase a set of bed sheets | 0 | 0.0% |

Next, these respondents were asked:

> Which of the following price ranges have you paid or would you consider paying the next time you purchase a <u>set of pillowcases</u>?
> *(Please select all that apply)*

The following table displays the options from which respondents could select and the proportion of final respondents who selected each:

| Have Paid or Would Consider Paying for Pillowcases | | |
|---|---|---|
| N=600 | N | % |
| Under $15 | 187 | 31.2% |
| $15 to $24.99 | 303 | 50.5% |
| $25 to $34.99 | 243 | 40.5% |
| $35 to $44.99 | 168 | 28.0% |
| $45 to $54.99 | 97 | 16.2% |
| $55 or more | 59 | 9.8% |
| Don't know/not sure | 9 | 1.5% |
| I have not purchased and do not plan to purchase a set of pillowcases | 4 | 0.7% |

Next, respondents were asked:

> Which of the following price ranges have you paid or would you consider
> paying the next time you purchase a <u>blanket or comforter</u>?
> *(Please select all that apply)*

The following table displays the options from which respondents could select and the
proportion of final respondents who selected each:

| Have Paid or Would Consider Paying for a Blanket or Comforter | | |
|---|---|---|
| N=600 | N | % |
| Under $100 | 198 | 33.0% |
| $100 to $149.99 | 294 | 49.0% |
| $150 to $199.99 | 237 | 39.5% |
| $200 to $249.99 | 169 | 28.2% |
| $250 to $299.99 | 106 | 17.7% |
| $300 or more | 60 | 10.0% |
| Don't know/not sure | 7 | 1.2% |
| I have not purchased and do not plan to purchase a blanket or comforter | 5 | 0.8% |

Respondents were then asked:

> Which of the following price ranges have you paid or would you consider
> paying the next time you purchase a <u>pillow</u>?
> *(Please select all that apply)*

The following table displays the options from which respondents could select and the
proportion of final respondents who selected each:

| Have Paid or Would Consider Paying for a Pillow | | |
|---|---|---|
| N=600 | N | % |
| Under $25 | 191 | 31.8% |
| $25 to $74.99 | 418 | 69.7% |

| | | |
|---|---|---|
| $75 to $124.99 | 199 | 33.2% |
| $125 to $174.99 | 109 | 18.2% |
| $175 to $224.99 | 76 | 12.7% |
| $225 or more | 35 | 5.8% |
| Don't know/not sure | 3 | 0.5% |
| I have not purchased and do not plan to purchase a pillow | 1 | 0.2% |

Respondents who selected at least one of the following product price ranges from this question series were considered part of the relevant sample universe and qualified to participate in the main survey:

- $125 or more for a set of bed sheets

- $25 or more for a set of pillowcases

- $100 or more for a blanket or comforter

- $25 or more for a pillow

This ensured that all respondents were actual or prospective purchasers of at least some bedding products in the price ranges of products offered by The Comphy Co.  By narrowing the overall universe of bedding customers to the subset who are prospective purchasers of the higher-priced products from The Comphy Co., the survey maximized the likelihood of detecting secondary meaning – i.e., actual association of the terms at issue with The Comphy Co. (or an unnamed single source).

The following table summarizes how many of the final 600 respondents met each of these qualifying amounts:

| Selected Qualifying Amount by Product | | |
|---|---|---|
| N=600 | N | % |
| $125 or more for a set of bed sheets | 266 | 44.3% |
| $25 or more for a set of pillowcases | 347 | 57.8% |
| $100 or more for a blanket or comforter | 510 | 85.0% |
| $25 or more for a pillow | 550 | 91.7% |

As shown in the previous tables, many additional respondents answered that they have paid or would consider paying even higher prices.

Upon completion of the main survey, respondents were also asked the following question for classification purposes:

> We have just one more brief question. Do you or does anyone in your household work for any of the following?
>
> *(Please select all that apply)*

The following table displays the list of randomized response options available to respondent and the proportion of final respondents that selected each:

| Employed in Related Field | | |
|---|---|---|
| N=600 | N | % |
| A company that makes bedding products | 7 | 1.2% |
| A store that sells bedding products | 10 | 1.7% |
| An advertising or market research company | 3 | 0.5% |
| None of these | 584 | 97.3% |

Excluding the 16 respondents who selected one of the above industries in response to this question would not impact the results of my analysis or conclusions.

The actual wording of the screening questions used is shown in Appendix B.

## SAMPLING PLAN

The sampling plan involved a random selection of consumers who are part of an online panel.

Online surveys are well-accepted in the field of survey research as a standard, reliable methodology.  Indeed, online surveys are now the most common method of conducting market research among consumers.  Businesses and other organizations routinely make decisions of importance based on the results of online survey research among consumers, and online surveys have been accepted in evidence in numerous U.S. District Court cases.  I have personally designed and executed numerous internet surveys that have been accepted by courts.

The sample of panelists used in the survey was provided by Critical Mix, a leading supplier of online sample for surveys.  I have worked with Critical Mix on previous surveys and have found its procedures and panels to be highly reliable.  Critical Mix has a large and diverse panel consisting of millions of participants and is highly regarded as a reputable source of respondents for online surveys within the field of market research.  Critical Mix utilizes appropriate industry procedures for ensuring the integrity and quality of its panels.  Quality and integrity of Critical Mix research panels are obtained and maintained in the following ways.

- It requires a double opt-in registration process, digital fingerprinting, and identity verification.
- It conducts matches against third-party databases and uses various techniques to identify speeders, flat-liners, and non-responders before they can enter a survey.
- Critical Mix uses a proprietary weighting system to continually evaluate its panelists' responses as well as monitor their activity. Based upon this information, it can accurately determine which respondents are providing insightful answers and eliminate those who are suspect.

- Critical Mix removes professional survey takers from its database by: comparing email addresses of all panel members to ensure respondents do not receive multiple survey invitations; maintaining a blacklist of bad respondents known to provide inaccurate data and preventing them from receiving surveys; using online reputation services that help detect if an IP address is home to a major spammer, thus enabling the exclusion of participation in a survey from that IP address.

The following table displays the final proportion of sample achieved by age and gender for each Group:

| Final Number of Respondents by Age and Gender | | | | |
|---|---|---|---|---|
| N=200 per Group | Men | | Women | |
| | N | % | N | % |
| 18 – 34 | 28 | 14.0% | 44 | 22.0% |
| 35 – 54 | 26 | 13.0% | 52 | 26.0% |
| 55 and older | 16 | 8.0% | 34 | 17.0% |

These proportions were achieved by observing the rates at which respondents in various age groups met the screening criteria (as purchasers of higher-end bedding products) and conforming the ending quota percentages proportionately. This methodology for producing a representative sample of the relevant category (here, consumers of bedding products in the price ranges of products offered by The Comphy Co.) is standard and well-accepted.

Survey invitations were sent across the U.S. in geographic proportion to Census data. The following table displays the final proportion of sample achieved by region:

| Final Number of Respondents by Region | | |
|---|---|---|
| N=600 | N | % |
| Midwest | 116 | 19.3% |
| Northeast | 128 | 21.3% |
| South | 92 | 15.3% |
| West | 117 | 19.5% |
| Southeast | 147 | 24.5% |

## DATA PROCESSING

Data was collected by Focus Vision, a company specializing in web survey programming and data collection and processing. Data from the survey was made available to Hal Poret, LLC through an electronic portal on an ongoing basis.  The data set showing respondents' answers to all questions is provided in electronic form.

## INTERVIEWING PROCEDURES

The online survey was programmed and hosted by Focus Vision.  My staff and I thoroughly tested the programmed survey prior to any potential respondents receiving the invitation to participate in the survey.

## DOUBLE-BLIND INTERVIEWING

The study was administered under "double-blind" conditions.  That is, not only were the respondents kept uninformed as to the purpose and sponsorship of the study, but the services involved in providing the sample and administering the online interviews (Focus Vision and Critical Mix) were similarly "blind" with respect to the study's purpose and sponsorship.

## INTERVIEWING PERIOD

Interviewing was conducted from August 29, 2018 through September 4, 2018.

## QUALITY CONTROL

Several measures were implemented to ensure a high level of quality control and validation with respect to respondents taking the survey.

Upon initially entering the survey, all respondents were required to pass a test to verify that each respondent is a live person. The test employed in this survey is a CAPTCHA[5] program that generates a task that humans can pass but current computer programs cannot. CAPTCHA is a well-known and widely-used tool in online survey research.

Upon successfully passing the CAPTCHA test, respondents were then asked to enter their year of birth and then their gender.  This information was checked against the sample provider's (Critical Mix's) demographics on record for each respondent and any respondent providing an incorrect or inconsistent birth year and/or gender was unable to continue to the main survey.

Additionally, respondents were then asked to select their age range. Respondents who selected an age range inconsistent with their year of birth were unable to continue with the survey.

These combined steps ensured that the survey was being taken by an actual live person and that each person was paying a certain level of attention to the survey questions and taking a certain level of care in entering responses.

All respondents were also asked to select any web browsers or search engines they have used in the past three months. Respondents could select as many as applied to them from a list of ten options, including, "other," "not sure" and one fictitious name: Hagelin. Respondents who selected "Hagelin" were unable to continue.  Additionally,

---

[5] CAPTCHA is an acronym for "Completely Automated Public Turing test to tell computers and Humans Apart."

respondents who answered that they have used all seven of the actual web browsers and search engines included on the response list, were identified as "yea-sayers" and unable to continue with the survey.[6]

The following question was also asked and permitted additional screening out of respondents who were paying insufficient attention or clicking responses indiscriminately:

> For quality assurance, please type the word "West" in the blank next to the "Other" box below and then click to continue.
>
> - Strongly agree
> - Agree
> - Neutral
> - Disagree
> - Strongly disagree
> - Other _____

Respondents who selected "other" and typed a response in the blank continued with the survey. A review was conducted of all open-ended answers, including responses to this question and respondents who failed to follow instructions for this question, or gave other non-responsive or nonsense answers to open-ended questions were removed from the final data.

Respondents were then also asked to carefully read these instructions:

*       Please take the survey in <u>one</u> session without interruption.

---

[6] "Yea-sayers" in surveys are typically defined as respondents who answer affirmatively to questions, regardless of their belief.

\* Please keep your browser maximized for the entire survey.

\* While taking the survey, please do not consult any other websites or other electronic or written materials.

\* Please answer all questions on your own without consulting any other person.

\* If you normally wear eye glasses or contact lenses when viewing a computer screen, please wear them for the survey.

Two options were provided in response to these instructions: 1) I understand and agree to the above instructions, and 2) I do not understand or do not agree to the above instructions.  Only respondents who understood and agreed to the instructions then continued to the main section of the survey.

Additionally, the survey program was set up in such a way as to restrict respondents from taking the survey via mobile phones.  This contributed to ensuring respondents could easily and clearly view each question and corresponding response options.

## DETAILED FINDINGS

**I.    Has Previously Seen or Heard of Term**

The following table illustrates the percentage of respondents that answered that they had seen or heard of the relevant term in each of the three Groups included in the survey:

| HAS SEEN OR HEARD OF TERM BEFORE [Q205] Have you ever seen or heard the following term before in connection with any bedding product or products? | | | |
|---|---|---|---|
| | COMPHY Test Group (N=200) | COMFY Test Group (N=200) | COMFORT Control Group (N=200) |
| Yes, I have | 27.5% 55 | 61.0% 122 | 79.5% 159 |
| No, I have not | 60.5% 121 | 29.0% 58 | 9.5% 19 |
| Not sure/don't know | 12.0% 24 | 10.0% 20 | 11.0% 22 |

As this table indicates, the large majority of purchasers of bedding products in the relevant price ranges have never seen or heard of the term COMPHY.  Only 27.5% answered that they have seen or heard of COMPHY.

61.0% of respondents answered that they have seen or heard of COMFY in connection with bedding products.

The subsequent questions address the extent to which these terms are associated with any particular source.

## II.     Associations of term with any source(s)

The following table displays the results to Question 210, inquiring as to whether or not the respondents associate the relevant term with any particular company/companies or brand(s):

| ASSOCIATES TERM WITH ANY PARTICULAR COMPANY OR BRAND [Q210] Do you associate the following term with any particular company or companies, or brand or brands, that offer bedding products? | | | |
|---|---|---|---|
| | COMPHY Test Group (N=200) | COMFY Test Group (N=200) | COMFORT Control Group (N=200) |
| Yes, I do | 20.0% 40 | 29.0% 58 | 39.0% 78 |
| No, I do not | 66.0% 132 | 54.5% 109 | 48.0% 96 |
| Don't know/no opinion | 14.0% 28 | 16.5% 33 | 13.0% 26 |

The following table shows the percentage of respondents in each Group who associate the relevant term with <u>only one</u> source:

| ASSOCIATES WITH ONLY ONE, OR MORE THAN ONE COMPANY/BRAND [Q215] Do you associate the following term with… | | | |
|---|---|---|---|
| | COMPHY Test Group (N=200) | COMFY Test Group (N=200) | COMFORT Control Group (N=200) |
| Only one company or brand that offers bedding products | 13.0% 26 | 5.0% 10 | 12.5% 25 |
| More than one company or brand that offers bedding products | 5.5% 11 | 22.0% 44 | 25.0% 50 |
| Don't know/no opinion | 1.5% 3 | 2.0% 4 | 1.5% 3 |
| Not asked | 80.0% 160 | 71.0% 142 | 61.0% 122 |

As the above table shows, in the Comphy Test Group, only 13.0% (26 out of 200) of respondents answered that they associate the term COMPHY with only one company or brand that offers bedding products.

Only 5.0% (10 out of 200) of respondents in the Comfy Test Group answered that they associate the term COMFY with only one company or brand.

These results (13.0% and 5.0%) are low and indicate a lack of secondary meaning even without accounting for survey noise.

Deducting the 12.5% noise rate at which the Control Group associated the control term (COMFORT) with only one company or brand from the Test Group secondary meaning rates, results in negligible net secondary meaning rates that are equivalent to zero:

| Net Secondary Meaning Rates – Associate with One Source | | |
|---|---|---|
| | COMPHY Test Group | COMFY Test Group |
| Test Groups – associate mark with a single source | 13.0% | 5.0% |
| Control Group - associate control with a single source | 12.5% | 12.5% |
| **Net Secondary Meaning results** | 0.5% | (7.5%) |

It is also worth noting that in the Comphy Test Group, only 8.0% of respondents (16 out of 200) had seen or heard the term COMPHY before in connection to bedding <u>and</u> also associate it with only one company or brand.

In the Comfy Test Group, only 3.0% (6 out of 200) had seen or heard the term COMPHY before in connection to bedding <u>and</u> also associate it with only one company or brand:

| ASSOCIATE TERM WITH ONLY ONE COMPANY AND HAD PREVIOUSLY SEEN/HEARD THE TERM | | |
|---|---|---|
| | COMPHY Test Group (N=200) | COMFY Test Group (N=200) |
| **Has seen or heard of before AND associates with only one company or brand** | **8.0%** **16** | **3.0%** **6** |
| Has seen or heard of before AND associate with more than one company or brand | 4.5% 9 | 20.0% 40 |
| Has seen or heard before AND does <u>not</u> associate with any particular company or brand, or does not know/no opinion | 15.0% 30 | 38.0% 76 |
| Has <u>not</u> seen or heard of term before, or is not sure/does not know | 72.5% 145 | 39.0% 78 |

These low figures further confirm that the terms have not acquired secondary meaning.

I also looked at results among subgroups of respondents who identified in the screening criteria that they have paid or would consider paying certain higher prices for each type of product. The following table displays the proportion of respondents in each subgroup that associate the term they were shown with only one company or brand:

| ASSOCIATES WITH ONLY ONE COMPANY/BRAND – Results by Subgroup | | | |
|---|---|---|---|
| Associates with only one company or brand that offers bedding products: | COMPHY Test Group | COMFY Test Group | COMFORT Control Group |
| Spends $125 or more for sheets | 22.5% (20 out of 89) | 10.4% (8 out of 77) | 17.0% (17 out of 100) |
| Spends $25 or more for pillowcases | 16.1% (18 out of 112) | 8.0% (9 out of 113) | 16.4% (20 out of 122) |
| Spends $100 or more for a blanket or comforter | 14.8% (25 out of 169) | 5.3% (9 out of 169) | 12.8% (22 out of 172) |
| Spends $75 or more for a pillow | 13.6% (25 out of 184) | 5.5% (10 out of 181) | 12.4% (23 out of 185) |

As this table shows, even among the subset of respondents who answered that they would pay higher prices (consistent with The Comphy Co. prices) for various bedding products, the Test Group rates of associating the terms COMPHY or COMFY with only one source do not meaningfully exceed the Control Group noise levels. This further confirms that the terms COMPHY and COMFY have not acquired a substantial degree of secondary meaning even among the subset of bedding purchasers who purchase bedding products in high enough price ranges to make them prospective purchasers of products from The Comphy Co.

### III.   Association With Only One Source and Identification of The Comphy Co.

The following table illustrates the proportion of respondents in each Test Group who answered that they associate the term COMPHY or COMFY with only one company or brand and then specifically named COMPHY as that company/brand:

| ASSOCIATES WITH ONLY ONE COMPANY/BRAND <u>AND</u> NAMED COMPHY AS THAT COMPANY/BRAND | |
|---|---|
| N=200 per Group | |
| COMPHY<br>Test Group | 5.0%<br>(10 out of 200) |
| COMFY<br>Test Group | 0.0%<br>(0 out of 200) |

The fact that only 5.0% of respondents answered that they associated "COMPHY" with one source and specifically named The Comphy Co. (or the Comphy brand) as that source (and that 0% did so for COMFY) further supports the conclusion that these terms have not acquired a substantial degree of secondary meaning.

### IV.   Conclusions

Based on the survey results, it is my opinion that the terms COMPHY and COMFY have not acquired secondary meaning among prospective purchasers of bedding products, including bedding products in the higher price ranges offered by The Comphy Co.


Hal Poret

Dated:  October 24,  2018

# APPENDIX A

**Hal L. Poret** (hal.inc42@gmail.com; 914-772-5087)

*Education*

1998        Harvard Law School, J.D., *cum laude*
   - Editor/Writer – Harvard Law Record
   - Research Assistant to Professor Martha Minow

1995        S.U.N.Y. Albany, M.A. in Mathematics, *summa cum laude*
   - Statistics
   - Taught calculus/precalculus/statistics

1993        Union College, B.S. in Mathematics with honors, *magna cum laude*
   - Phi Beta Kappa
   - Resch Award for Achievement in Mathematical Research

*Employment*

2016 -        President, Hal Poret LLC
   - Design, supervise, and analyze consumer surveys, including Trademark, Trade Dress, Advertising Perception, Consumer Deception, Claims Substantiation studies, Damages, and Corporate Market Research Surveys
   - Consulting regarding survey design and review of other surveys
   - Provided expert testimony at deposition and/or trial regarding survey research in over 100 U.S. District Court litigations and proceedings in front of TTAB, NAD, FTC and FCC.

2004  - 2015        Senior Vice President, ORC International
   - Designed, supervised, and analyzed consumer surveys in legal and corporate market research areas, and provided expert testimony regarding survey research in legal cases.

2003 – 2004        Internet Sports Advantage
   - Developed and marketed proprietary internet sports product, and licensed trademark and intellectual property rights.

1998 – 2003        Attorney, Foley Hoag & Eliot, Boston, MA
   - Represented corporations and individuals in trademark, trade dress, advertising, product, and related legal disputes.
   - Worked with survey experts in developing and using surveys as evidence in trademark, trade dress and advertising disputes.

*Testimony at Trial or by Deposition Past 4 Years*

(Party who retained me shown in bold)

2018    MZ Wallace v. **Oliver Thomas**
        (Deposition)                         USDC Southern District of NY

2018    **Wing Enterprises** v. Tricam Industries, Inc.
        (Deposition)                         USDC District of MN

2018    Kjaer Weis v. **Kimsaprincess, Inc.**
        (Deposition)                         USDC Central District of CA

2018    In re: NCAA Grant-in-Aid Cap Litigation
        (Deposition; Trial)                  USDC Northern District of CA

2018    **Under Armour** v. Battle
        (Deposition)                         USDC District of Maryland

2018    Federal Trade Commission v. **D-Link Systems**
        (Deposition)                         USDC Northern District of CA

2018    Ezaki Glico v. **Lotte International**
        (Deposition)                         USDC District of NJ

2018    Car Freshener Corporation v. **American Covers/Energizer Holdings**
        (Deposition)                         USDC Northern District of NY

2018    **Combe** v. Dr. August Wolff
        (Deposition)                         USDC Eastern District of VA

2018    In Re GM Ignition Switch Litigation
        (Deposition)                         USDC Southern District of NY

2018    Zetor v. **Ridgeway**
        (Trial Testimony Deposition)         USDC Western District of AR

2018    Superior Consulting v. **Shaklee**
        (Deposition; Hearing; Trial)         USDC Middle District of FL

2018    Monster Energy Company v. **Integrated Supply Network**
        (Deposition)                         USDC Central District of CA

2018    Sandoz v. **GlaxoSmithkline**
        (Deposition)                            USPTO Opposition

2018    JB-Weld v. **Gorilla Glue Company**
        (Deposition)                            USDC Northern District of GA

2018    Bratton v. **The Hershey Company**
        (Deposition)                            USDC Western District of MO

2018    Leadership Studies v. **Blanchard Training & Development**
        (Deposition)                            USDC Southern District of CA

2017    **Gulfstream Aerospace** v. Gulfstream Unsinkable Boats
        (Deposition)                            USPTO Opposition/Cancellation

2017    **Mercado Latino** v. Indio
        (Deposition)                            USDC Central District of CA

2017    Delalat v. **Nutiva**
        (Deposition)                            USDC Northern District of CA

2017    Dashaw v. **New Balance**
        (Deposition)                            USDC Southern District of CA

2017    **Bearing Tech** v. O'Reilly Automotive
        (Deposition)                            USDC Western District of MO

2017    Soundview v. **Facebook**
        (Deposition)                            USDC District of Delaware

2017    Rovi v. **Comcast**
        (Deposition)                            USDC Southern District of NY

2017    Puma v. **Black & Decker**
        (Trial)                                 New Mexico Circuit Court

2017    **Select Comfort v.** Personal Comfort
        (Trial and Deposition)                  USDC District of Minn

2017    **Alzheimer's Foundation of America** v. Alzheimer's Association
        (Deposition and trial)                  USDC Southern District of NY

2017    **Banc of California** v. Farmers & Merchants Bank

(Deposition)                                    USDC Central District of CA

2017    PolyGroup v. **Willis Electric**
        (Deposition)                            Patent Trial and Appeal Board

2017    Mullins v. **Premier Nutrition**        USDC Northern District of CA
        (Depositions in Class Cert and Merits phases)

2017    Lion's Gate v. **TD Ameritrade**
        (Deposition)                            USDC Central District of CA

2017    **Deere & Company** v. Fimco dba Schaben
        (Deposition and trial)                  USDC Western District of KY

2017    **Adidas & Reebok** v. TRB
        (Deposition)                            USDC District of Oregon

2017    **Church & Dwight** v. SPD              USDC Southern District of NY
        (Deposition/trial in liability phase; deposition/trial in damages phase)

2017    In re: **Coca Cola** Marketing and Sales Practices Litigation (No. II)
        (Deposition)                            USDC Northern District of CA

2017    **Ducks Unlimited** v. Boondux LLC and Caleb Sutton
        (Deposition and Trial)                  USDC Western District of TN

2017    Globefill v. **Element Spirits**
        (Deposition and Trial)                  USDC Central District of CA

2017    Brickman v. **Fitbit**
        (Deposition)                            USDC Northern District of CA

2017    Network-1 Technologies v. **Alcatel-Lucent et al.**
        (Deposition)                            USDC Eastern District of TX

2017    Health Partner Plans v. **Reading Health Partners**
        (Deposition and Injunction hearing)     USDC Eastern District of PA

2017    In Re **Biogen** '755 Patent Litigation
        (Deposition)                            USDC District of NJ

2017    **Cava Mezze** v. Mezze Mediterranean Grill
        (Trial)                                 USDC District of MD

2017   Mastrandrea v. **Vizio**
     (Deposition)                USDC Central District of CA

2017   **Adidas** v. Skechers
     (Deposition and Injunction hearing)   USDC District of OR

2016   **Triumph International, Inc.** v. Gourmetgiftbaskets.com, Inc.
     (Deposition)                USDC Central District of CA

2016   Phelan Holdings v. **Rare Hospitality Management**
     (Deposition)                USDC Middle District of FL

2016   **Intellectual Ventures II** v. AT&T Mobility
     (Deposition)                USDC District of DE

2016   **One World Foods** v. Stubbs Austin Restaurant Company
     (Deposition)                USDC Western District of TX

2016   **Booking.com B.V.** v. Michelle Lee
     (Deposition)                USDC Eastern District of VA

2016   Variety Stores v. **Walmart Stores, Inc.**
     (Trial)                    USDC Eastern District of NC

2016   **American Cruise Lines** v. American Queen Steamboat Company
     (Deposition)                USDC District of DE

2016   Universal Church v. **Univ. Life Church**
     (Deposition)                USDC Southern District of NY

2016   **U. of Houston** v. Houston Col. of Law
     (Deposition)                USDC Southern District of TX

2016   Navajo Nation v. **Urban Outfitters**
     (Daubert Hearing)           USDC District of NM

2016   Beaulieu v. **Mohawk Carpet Dist.**
     (Deposition)                USDC Northern District of GA

2016   Efficient Frontiers v. **Reserve Media**
     (Deposition)                USDC Central District of CA

| 2016 | **McAirlaids** v. Medline Industries (Deposition) | USDC Eastern District of VA |
|---|---|---|
| 2016 | **Under Armour** v. Ass Armor (Deposition) | USDC Southern District of FL |
| 2016 | **C5 & CoorsTek** v. CeramTec (Deposition and trial) | USDC District of Colorado |
| 2016 | **BBC** v. Stander (Deposition) | USDC Central District of CA |
| 2016 | **Caterpillar** v. Tigercat (Deposition) | USPTO Opposition |
| 2016 | Premier v. **Dish Network** (Deposition) | USPTO Opposition |
| 2016 | **Omaha Steaks** v. Greater Omaha (Rebuttal Testimony) | USPTO Opposition |
| 2016 | **EMC** v. Pure Storage (Deposition) | USDC District of MA |
| 2016 | **Top Tobacco** v. North Atlantic (Deposition) | USPTO Opposition |
| 2016 | Ascension Health v. **Ascension Ins.** (Deposition) | USDC Eastern District of MO |
| 2016 | **Quoc Viet** v. VV Foods (Deposition and trial) | USDC Central District of CA |
| 2016 | Joules v. **Macy's Merchandising Group** (Deposition and trial) | USDC Southern District of NY |
| 2015 | MMG v. **Heimerl & Lammers** (Deposition and trial) | USDC District of MN |
| 2015 | **PRL USA** v. Rolex (Deposition) | USDC Southern District of NY |
| 2015 | Bison Designs v. **Lejon** | |

|  | (Deposition) | USDC District of CO |
|---|---|---|
| 2015 | Barrera v. **Pharmavite** (Deposition) | USDC Central District of CA |
| 2015 | **Flowers** v. Bimbo Bakeries (Deposition) | USDC Middle District of GA |
| 2015 | Razor USA v. **Vizio** (Deposition) | USDC Central District of CA |
| 2015 | Allen v. **Simalasan** (Deposition) | USDC Southern District of CA |
| 2015 | BMG Rights Mgmt. v. **Cox Enterprises** (Deposition and trial) | USDC Eastern District of VA |
| 2015 | Verisign v. **XYZ.COM LLC** (Deposition) | USDC Eastern District of VA |
| 2015 | Farmer Boys v. **Farm Burger** (Deposition) | USDC Central District of CA |
| 2015 | Ono v. **Head Racquet Sports** (Deposition) | USDC Central District of CA |
| 2015 | **Select Comfort v.** Tempur Sealy (Deposition) | USDC District of Minn |
| 2015 | ExxonMobil v. **FX Networks** (Deposition) | USDC Southern District of TX |
| 2015 | **Delta** v. Network Associates (Deposition) | USDC Middle District of FL |
| 2015 | Brady v. **Grendene** (Deposition) | USDC Central District of CA |
| 2015 | **Zippo** v. LOEC (Deposition) | USDC Central District of CA |
| 2015 | Maier v. **ASOS** (Deposition) | USDC District of Maryland |

2015   **Converse** In re: Certain Footwear
       (Deposition and trial)                    International Trade Commission

2014   Scholz v. **Goudreau**
       (Deposition)                              USDC District of Mass

2014   **Economy Rent-A-Car** v. Economy Car Rentals
       (TTAB Testimony)                          USPTO

2014   Weber v. **Sears**
       (Deposition)                              USDC Northern District of IL

2014   Native American Arts v. **Stone**
       (Deposition)                              USDC Northern District of IL

2014   Gravity Defyer v. **Under Armour**
       (Trial)                                   USDC Central District of CA

2014   **Adams** v. Target Corporation
       (Deposition)                              USDC Central District of CA

2014   PODS v. **UHAUL**
       **(**Deposition and trial**)**            USDC Middle District of FL

2014   Flushing v. **Green Dot Bank**
       (Deposition)                              USDC Southern District of NY

2014   Amy's Ice Creams v. **Amy's Kitchen**
       (Deposition)                              USDC Western District of TX

2014   **Unity Health** v. UnityPoint
       (Deposition)                              USDC Western District of WI

2014   In re: NCAA Student-athlete litigation
       (Deposition and Trial)                    USDC Northern District of CA

2014   Spiraledge v. **SeaWorld**
       (Deposition)                              USDC Southern District of CA

2014   **Diageo N.A. v.** Mexcor
       (Deposition and trial)                    USDC Southern District of TX

| 2014 | **Pam Lab** v. Virtus Pharmaceutical<br>(Deposition and trial) | USDC Southern District of FL |
|------|---|---|
| 2014 | **US Soccer Federation** v. Players Ass'n<br>(Arbitration Testimony) | Arbitration |
| 2014 | **Estate of Marilyn Monroe** v. AVELA<br>(Deposition) | USDC Southern District of NY |
| 2014 | Kelly-Brown v. **Winfrey, et al.**<br>(Deposition) | USDC Southern District of NY |
| 2014 | Virco Mfg **v. Hertz & Academia**<br>(Deposition) | USDC Central District of CA |
| 2014 | In re: Hulu Privacy Litigation<br>**(Deposition)** | USDC Northern District of CA |

## *Presentations*

What's New in Advertising Law, Claim Support and Self-Regulation?
(ABA Seminar, November 17, 2015)

How Reliable is Your Online Survey
(2015 ASRC Annual Conference, September 29, 2015)

What Do Consumers Think?  Using Online Surveys to Demonstrate Implied Claims
(ANA Advertising Law and Public Policy Conference, April 1, 2015)

Cutting Edge Developments in Trademark Surveys (Rocky Mountain Intellectual
Property & Technology Institute, May 30, 2013)

Using Survey Experts in Trademark Litigation (DRI Intellectual Property Seminar, May
9, 2013)

Surveys in Trademark and Advertising Litigation  (2013 National CLE Conference,
Snowmass Colorado, January 2013)

Internet Survey Issues (PLI Hot Topics in Advertising Law Conference, March 2012)

Measuring Consumer Confusion Through Online Surveys (2011 Midwest IP Institute)
(September, 2011)

Online Surveys as Evidence in Trademark Disputes (International Trademark
Association Annual Conference, May 2011)

Managing Intellectual Property Trademark Roundtable (April 7, 2010)

Recent Trends in Trademark Surveys (Virginia State Bar Intellectual Property
Conference, October 2009)

Trademark Surveys in US Litigation (presentation for International Trademark
Association Annual Conference) (May 2009)

How to Conduct Surveys for use in Trademark Disputes (Practicing Law Institute
Advanced Trademark Law Conference) (May 2009)

Trademark and Advertising Perception Studies for Legal Disputes (Opinion Research
Corporation Seminar, June 2008)

Understanding Advertising Perception Surveys (Promotions Marketing Association
Annual Law Conference) (November 2007)

Designing and Implementing Studies to Substantiate Advertising Claims (American
Conference Institute Claims Substantiation Conference, October 2007)

Surveys in Trademark and False Advertising Disputes (InfoUSA Webinar, June 2007)

Measuring Consumer Perception in False Advertising and Trademark Cases, (multiple
presentations) (2007)

Potential Errors to Avoid In Designing a Trademark Dilution Survey (American
Intellectual Property Association paper, April 2007)

Consumer Surveys in Trademark and Advertising Cases (presentation at Promotions
Marketing Association Annual Law Conference) (December 2006)

Use of Survey Research and Expert Testimony in Trademark Litigation, (International
Trademark Association Annual Conference, May 2006)

Survey Research as Evidence in Trademark/Trade Dress Disputes (multiple
presentations) (2006)

Using Surveys to Measure Secondary Meaning of Trade Dress, Legal Education
Seminar, Boston, April 2006

*Publications/Papers*

Cutting Edge Developments in Trademark Surveys (Rocky Mountain Intellectual Property & Technology Institute, May 2013)

Hot Topics and Recent Developments in Trademark Surveys (paper for May 2013 DRI Intellectual Property Conference)

Surveys in Trademark and Advertising Litigation (2013 National CLE Conference, Snowmass Colorado, January 2013)

Trademark Litigation Online Consumer Surveys (Practical Law Company Intellectual Property and Technology, May 2012)

Hot Topics in Advertising Law 2012 (Contributor to Practising Law Institute publication)

A Comparative Empirical Analysis of Online Versus Mall and Phone Methodologies for Trademark Surveys, 100 TMR 756 (May-June 2010)

Recent Trends in Trademark Surveys (paper for Virginia State Bar Intellectual Property conference, October 2009)

Trademark Dilution Revision Act breathes new life into dilution surveys (In Brief PLI website, June 2009)

The Mark (Survey Newsletter; three editions 2009)

Hot Topics in Trademark Surveys (paper for Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

The Mark (Survey Newsletter, 2008)

Trademark and Advertising Survey Report (Summer 2007)

Avoiding Pitfalls in Dilution Surveys under TDRA (AIPLA Spring Conference, Boston, May 2007)

*Commentary*

<u>Comment on Hotels.com case</u> (on TTABLOG.COM, July 24, 2009)

<u>Comment on Nextel v. Motorola</u> (on TTABLOG.COM, June 19, 2009)

<u>PLI All-Star Briefing Newsletter,</u> "What does the Trademark Dilution Revision Act mean for the future of Dilution Surveys?" (June 2009)

*Professional Memberships/Affiliations*

American Association of Public Opinion Research

International Trademark Association

National Advertising Division of Council of Better Business Bureaus

# APPENDIX B

Appendix B: Secondary Meaning Questionnaire

| SCREENER |
| --- |

**BASE: ALL RESPONDENTS**
Q99    Insert Captcha [HIDE "YOU ARE HUMAN" SCREEN]


**BASE: ALL RESPONDENTS**
Q100.  Please select your year of birth. **[PROGRAMMER: DROP DOWN MENU. TERMINATE IF DOES NOT MATCH PANELIST'S PRELOAD.]**


**ASK IF: HAS NOT TERMINATED**
Q105   Are you… **[CHECK AGAINST PANEL VARIABLE AND TERMINATE IF IT DOES NOT MATCH]**
1.  Male [PROGRAMMER: FOR PANEL VARIABLE PLEASE ASSIGN VALUE OF "1" FOR MALE]
2.  Female [PROGRAMMER: FOR PANEL VARIABLE PLEASE ASSIGN VALUE OF "2" FOR FEMALE]


**ASK IF: HAS NOT TERMINATED**
Q107   Which of these age ranges includes your age?
       **[TERMINATE IF UNDER 18 OR AGE RANGE NOT POSSIBLE BASED ON YEAR OF BIRTH ENTERED IN Q100. NOTE – Each respondent can have two possible ages depending on if respondent's birthday has passed.]**
           1.  Under 18 [TERMINATE]
           2.  18-34
           3.  35-54
           4.  55 or older

1

Appendix B: Secondary Meaning Questionnaire

**BASE: ANY NON-TERMINATES**
Q109   Which of the following web browsers or search engines, if any, have you
used in the past 3 months?

*Please select all that apply.*
[RANDOMIZE]
1. Google Chrome
2. Internet Explorer
3. Microsoft Edge
4. Bing
5. Yahoo
6. Firefox
7. Opera
8. Hagelin
9. Other **[ANCHOR]**
10. Not sure **[ANCHOR; EXCLUSIVE]**

**[Terminate if selects 109/8 or if selects all of 109/1-7]**

**ASK IF: HAS NOT TERMINATED**
Q110   In what state do you live?
**[PROGRAMMER: Drop down menu of states plus D.C. Include an
option for "Other" and terminate if it is selected.]**

**ASK IF: HAS NOT TERMINATED**
Q120   In the past 12 months, which of the following, if any, have you personally
purchased?
*(Select all that apply)*
[RANDOMIZE]
1. Bed sheets, pillows, blankets, or other bedding
2. Towels, washcloths, bathmats, or other bath sheets
3. Clothes bins, storage units, hangers, or other organizers
4. Kitchen blender, processor, crockpot, or other appliance
5. Desktop, laptop, tablet, or other computer
6. None of these **[ANCHOR; EXCLUSIVE]**

**ASK IF: HAS NOT TERMINATED**
Q130   In the next 12 months, which of the following, if any, are you likely to
consider purchasing?
*(Select all that apply)*
[REPEAT SAME LIST OF OPTIONS AS SHOWN IN Q120 IN SAME
ORDER]

**[MUST SELECT AT LEAST ONE OF Q120=1, Q130=1 (BEDDING) TO CONTINUE; OTHERWISE, TERMINATE.]**


**ASK IF: 120=1 AND/OR 130=1**

Q140   Which of the following price ranges have you paid or would you consider paying the next time you purchase a <u>set of bed sheets</u>?

*(Please select all that apply)*
1. Under $75
2. $75 to $124.99
3. $125 to $174.99
4. $175 to $224.99
5. $225 to $274.99
6. $275 or more
7. Don't know/not sure **[ANCHOR; EXCLUSIVE]**
8. I have not purchased and do not plan to purchase a set of bed sheets **[ANCHOR; EXCLUSIVE]**

**ASK IF: 120=1 AND/OR 130=1**

Q150   Which of the following price ranges have you paid or would you consider paying the next time you purchase a <u>set of pillowcases</u>?

*(Please select all that apply)*
1. Under $15
2. $15 to $24.99
3. $25 to $34.99
4. $35 to $44.99
5. $45 to $54.99
6. $55 or more
7. Don't know/not sure **[ANCHOR; EXCLUSIVE]**
8. I have not purchased and do not plan to purchase a set of pillowcases **[ANCHOR; EXCLUSIVE]**

Appendix B: Secondary Meaning Questionnaire

**ASK IF: 120=1 AND/OR 130=1**

Q155   Which of the following price ranges have you paid or would you consider paying the next time you purchase a <u>blanket or comforter</u>?

*(Please select all that apply)*
1.  Under $100
2.  $100 to $149.99
3.  $150 to $199.99
4.  $200 to $249.99
5.  $250 to $299.99
6.  $300 or more
7.  Don't know/not sure **[ANCHOR; EXCLUSIVE]**
8.  I have not purchased and do not plan to purchase a blanket or comforter **[ANCHOR; EXCLUSIVE]**


**ASK IF: 120=1 OR 130=1**

Q160   Which of the following price ranges have you paid or would you consider paying the next time you purchase a <u>pillow</u>?

*(Please select all that apply)*
1.  Under $25
2.  $25 to $74.99
3.  $75 to $124.99
4.  $125 to $174.99
5.  $175 to $224.99
6.  $225 or more
7.  Don't know/not sure **[ANCHOR; EXCLUSIVE]**
8.  I have not purchased and do not plan to purchase a pillow **[ANCHOR; EXCLUSIVE]**

**[MUST SELECT AT LEAST ONE OF THE FOLLOWING TO CONTINUE; OTHERWISE, TERMINATE:**
**Q140 = 3-6 ($125+)**
**Q150= 3-6 ($25+)**
**Q155 = 2-6 ($100+)**
**Q160 = 2-6 ($25+)]**

**ASK IF: HAS NOT TERMINATED**

Q170  For quality assurance, please type the word "West" in the blank next to the "Other" box below and then click to continue.

       1.  Strongly agree

       2.  Agree

       3.  Neutral

       4.  Disagree

       5.  Strongly disagree

       6.  Other _____ [DO NOT FORCE TEXT BOX]

[TERMINATE IF SELECTED 170/1-5 OR DOES NOT TYPE IN AN ANSWER. i.e. MUST SELECT r6 AND TYPE SOMETHING IN TO CONTINUE.]

**ASK IF: HAS NOT TERMINATED**

Q180  You have qualified to take this survey.  Before continuing, please carefully read these instructions:

\*      Please take the survey in <u>one</u> session without interruption.

\*      Please keep your browser maximized for the entire survey.

\*      While taking the survey, please do not consult any other websites or other electronic or written materials.

\*      Please answer all questions on your own without consulting any other person.

\*      If you normally wear eye glasses or contact lenses when viewing a computer screen, please wear them for the survey.

       1.  I understand and agree to the above instructions

       2.  I do not understand or do not agree to the above instructions **[TERMINATE]**

[ONLY QUALIFIED RESPONDENTS BEYOND THIS POINT. EACH RESPONDENT SHOULD BE ASSIGNED TO ONE CELL. RANDOMIZE CELL ASSIGNMENT, BUT PRIORITIZE BASED ON NEED TO MEET AGE/GENDER QUOTAS.]

**[PROGRAMMING NOTE: DISPLAY ANY TEXT WITH ITS OWN QUESTION NUMBER ON A SCREEN BY ITSELF]**

| MAIN SURVEY |
| --- |

**BASE: ALL QUALIFIED RESPONDENTS**

Q200   On the next screen you will be shown a term that you may or may not
have seen or heard before in connection with bedding products, such as
sheets, pillowcases, pillows, blankets/comforters, or other bedding.

You will be asked some questions about the term.

For any question, if you have no opinion or do not know, then please
indicate so.  Please do not guess.

**BASE: ALL QUALIFIED RESPONDENTS**

Q205. Have you ever seen or heard the following term before in connection with
any bedding product or products?

**[PROGRAMMER: INCLUDE 2 LINE SPACES AND INDENT AND
INSERT THE FOLLOWING TERM ACCORDING TO CORRECT
CELL:**

**IF CELL 1:**
# COMPHY

**IF CELL 2:**
# COMFY

**IF CELL 3:**
# COMFORT

**[Display the following beneath the term. Randomize whether list is
shown 1/2/3 or 2/1/3]**
*(Select one choice)*
1.  Yes, I have
2.  No, I have not
3.  Not sure/don't know **[ANCHOR]**


**BASE: ALL QUALIFIED RESPONDENTS**

210.    Do you associate the following term with any particular company or
        companies, or brand or brands, that offer bedding products?
        **[PROGRAMMER: Display same term as in 205]**

        **[Display the following beneath the term. Randomize whether list is
        shown 1/2/3 or 2/1/3]**
        *(Select one choice)*
        1.  Yes, I <u>do</u>
        2.  No, I do <u>not</u>
        3.  Don't know/no opinion

**<u>BASE: 210=1</u>**
215     Do you associate the following term with…
        **[PROGRAMMER: Display same term as in 205]**

        **[Display the following beneath the term. Randomize whether list is
        shown 1/2/3 or 2/1/3]**
        *(Select one choice)*
        1.  Only one company or brand that offers bedding products
        2.  More than one company or brand that offers bedding products
        3.  Don't know/no opinion **[ANCHOR]**


**<u>BASE: 215=1</u>**
220     **<u>What company or brand</u>** do you associate the following term with?

        **[PROGRAMMER: Display same term as in 205]**

        **[Programmer: provide text box and "don't know" button. Force text or
        DK, but do not allow both.]**


**<u>BASE: Q220=Don't know</u>**
230     What made you answer that you associate the following term with only
        one company or brand that offers bedding products?

        **[PROGRAMMER: Display same term as in 205]**

        Please be as detailed and specific as you can.
        **(Programmer: insert large text box)**


**<u>BASE: ALL QUALIFIED RESPONDENTS</u>**

300.    We have just one more brief question. Do you or does anyone in your household work for any of the following?

   *(Please select all that apply)*
   [RANDOMIZE]
   1.    A company that makes bedding products
   2.    A store that sells bedding products
   3.    An advertising or market research company
   4.    None of these **[ANCHOR; EXCLUSIVE]**

# APPENDIX C

Appendix C: Survey Screenshots

## SCREENER

### Q99



### Q100



### Q105



Appendix C: Survey Screenshots

Q107



Q109

Q110

Appendix C: Survey Screenshots

Q120

In the past 12 months, which of the following, if any, have you personally purchased?
*(Select all that apply)*

- Towels, washcloths, bathmats, or other bath sheets
- Desktop, laptop, tablet, or other computer
- Kitchen blender, processor, crockpot, or other appliance
- Bed sheets, pillows, blankets, or other bedding
- Clothes bins, storage units, hangers, or other organizers
- None of these

26%

Continue »

Privacy Policy - Help

Q130

In the next 12 months, which of the following, if any, are you likely to consider purchasing?
*(Select all that apply)*

- Towels, washcloths, bathmats, or other bath sheets
- Desktop, laptop, tablet, or other computer
- Kitchen blender, processor, crockpot, or other appliance
- Bed sheets, pillows, blankets, or other bedding
- Clothes bins, storage units, hangers, or other organizers
- None of these

31%

Continue »

Privacy Policy - Help

3

Appendix C: Survey Screenshots

## Q140

36%

Which of the following price ranges have you paid or would you consider paying the next time you purchase a set of bed sheets?
*(Please select all that apply)*

- [ ] Under $75
- [ ] $75 to $124.99
- [ ] $125 to $174.99
- [ ] $175 to $224.99
- [ ] $225 to $274.99
- [ ] $275 or more
- [ ] Don't know/not sure
- [ ] I have not purchased and do not plan to purchase a set of bed sheets

Continue »

Privacy Policy - Help

## Q150

45%

Which of the following price ranges have you paid or would you consider paying the next time you purchase a set of pillowcases?
*(Please select all that apply)*

- [ ] Under $15
- [ ] $15 to $24.99
- [ ] $25 to $34.99
- [ ] $35 to $44.99
- [ ] $45 to $54.99
- [ ] $55 or more
- [ ] Don't know/not sure
- [ ] I have not purchased and do not plan to purchase a set of pillowcases

Continue »

Privacy Policy - Help

Appendix C: Survey Screenshots

Q155



Which of the following price ranges have you paid or would you consider paying the next time you purchase a blanket or comforter?
*(Please select all that apply)*

- Under $100
- $100 to $149.99
- $150 to $199.99
- $200 to $249.99
- $250 to $299.99
- $300 or more
- Don't know/not sure
- I have not purchased and do not plan to purchase a blanket or comforter

Continue »

Privacy Policy - Help

Q160



Which of the following price ranges have you paid or would you consider paying the next time you purchase a pillow?
*(Please select all that apply)*

- Under $25
- $25 to $74.99
- $75 to $124.99
- $125 to $174.99
- $175 to $224.99
- $225 or more
- Don't know/not sure
- I have not purchased and do not plan to purchase a pillow

Continue »

Privacy Policy - Help

5

Appendix C: Survey Screenshots

## Q170



## Q180



Appendix C: Survey Screenshots

## MAIN SURVEY

### Q200

77%

On the next screen you will be shown a term that you may or may not have seen or heard before in connection with bedding products, such as sheets, pillowcases, pillows, blankets/comforters, or other bedding.

You will be asked some questions about the term.

For any question, if you have no opinion or do not know, then please indicate so. Please do not guess.

Continue »

Privacy Policy - Help

## CELL 1 – COMPHY

### Q205



82%

Have you ever seen or heard the following term before in connection with any bedding product or products?

# COMPHY

*(Select one choice)*

○ No, I have not
○ Yes, I have
○ Not sure/don't know

Continue »

Privacy Policy - Help

Appendix C: Survey Screenshots

Q210



Q215



Q220



Appendix C: Survey Screenshots

## Q230



## CELL 2 – COMFY

## Q205



Appendix C: Survey Screenshots

Q210



Q215



Appendix C: Survey Screenshots

Q220



Q230



Appendix C: Survey Screenshots

CELL 3 – COMFORT

## Q205



## Q210



Appendix C: Survey Screenshots

Q215



Q220



Appendix C: Survey Screenshots

Q230



ALL CELLS

Q300

# APPENDIX D

Native File